IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS C. SKRUTSKI,               :
                                  :
            Plaintiff             :   No. 3:CV-03-2280
                                  :
            v.                    :   Complaint Filed 12/15/03
                                  :
JOSEPH MARUT, MICHAEL L. BRICE,   :   (Judge Muir)
REBECCA S. WARNER AND WANDA       :
GILBERT,                          :
                                  :
            Defendants            :

OPINION

MUIR, District Judge.

I.   Introduction.

On December 15, 2003, Plaintiff Thomas C. Skrutski, a
Corporal with the Pennsylvania State Police, filed a civil rights
complaint pursuant to 42 U.S.C. § 1983 against four other
individuals employed by the Pennsylvania State Police.  On April
15, 2005, Skrutski filed an amended complaint.  Named as
defendants in the amended complaint are the following
individuals: (1) Joseph Marut, who at the time of the filing of
the amended complaint was a Captain with the Pennsylvania State
Police;[1] (2) Michael L. Brice, who is employed by the
Pennsylvania State Police as the station commander at the Gibson
barracks; (3) Rebecca S. Warner, a criminal investigator with the
Pennsylvania State Police; and (4) Wanda Gilbert. who was a
Lieutenant with the Pennsylvania State Police.[2]

_____

1.  Marut has been promoted to Major effective July 30, 2005, and
maintains an office at the Wyoming Station as Area II Commander.

2.  Gilbert is no longer employed by the Pennsylvania State
Police.

In the amended complaint Skrutski alleges that his rights under the First Amendment to the United States Constitution were violated when he was retaliated against for reporting violations of State Police regulations and possible criminal acts by other individuals employed by the State Police. He contends the retaliation took the form, inter alia, of improper discipline and reassignment. He further contends that he was denied procedural due process and equal protection of the law as a result of being subjected to an arbitrary and capricious standard different from the standard to which other Pennsylvania State Police officers are held.  The "Operative Facts" section of Skrutski's amended complaint states in part as follows:

> 8.)  The defendant Marut is involved in a personal relationship with the defendant Warner.
>
> 9.)  The defendant Warner is a close personal friend of the defendant Gilbert, who, upon information and belief, vacations with Warner, and frequently sleeps over at her house.
>
> 10.)  Warner exercises significant control over Marut who does what Warner tells him to do.
>
> 11.)  On or about February 2003 Marut ordered Skrutski to pack his personal belongings and immediately transferred him to Honesdale from Gibson where he had worked for a number of years.
>
> 12.) There had been no investigation, no charges, no factual determination of any type, it was arbitrary and capricious transfer by Marut.
>
> 13.)  In addition to the arbitrary and unlawful disciplinary transfer of the plaintiff Marut also effected a number of other adverse employment actions against the plaintiff.
>
> 14.)  Marut severely admonished plaintiff because he had issued Warner a supervisory notation for what was, in effect, insubordinate misconduct.

2

15.)  Warner brought a totally vacuous, false, and frivolous complaint against the plaintiff for creating a hostile work environment.  In fact, it was Marut, Brice, Warner and Gilbert who had decided to work together and create a hostile environment within the Pennsylvania State police for plaintiff because he would not alter investigations falsely, refused to avoid the proper enforcement of PSP regulations, reported misconduct, and placed his responsibility to follow the established requirements of the Pennsylvania State police above blind loyalty to his immediate supervisors.

16.)  The above named defendants unlawfully agreed to work together to conduct a false and unlawful investigation into the plaintiff in an effort to destroy his career with the Pennsylvania State Police.

17.)  The above named defendants enlisted the support and assistance of other officers in the department including department disciplinary officers . . . in their efforts to destroy the career of Thomas C. Skrutski.

18.)  Upon information and belief it is averred by plaintiff that the above named defendants purposely composed and improperly conducted a pretextual investigation characterized in part by unlawful actions.

   a.) Marut selected Gilbert to do the investigation because she was a personal friend of Warner's and a confidant of his and hers.  The selection of Gilbert was also in violation of [administrative regulations].

   b.)  Reached back more than 10 years and solicited vague general negative comments about plaintiff in order to justify their pretextual investigation.

   c.)  Distorted facts and circumstances intentionally to place plaintiff in a false light, in effect intentionally skewering and distorting the investigation to harm plaintiff.

   d.) Initiated and conducted false and baseless investigations and accusation into and about the plaintiff.

   e.)  Conspired to create a baseless and unlawful

> disciplinary action against the plaintiff to
> cover-up the unlawful disciplinary transfer by
> defendant Marut which was itself based upon false
> and baseless accusations by Warner who wished to
> demonstrate her internal influence with her lover
> Captain Marut.
>
> 19.   The actions of the defendants were unlawful and
> were directed at the plaintiff because he spoke out
> and spoke up about the criminal misconduct of PSP
> members who were friends of certain defendants, and
> because he properly fulfilled his supervisory
> responsibilities in citing Warner as per PSP
> regulations.

Doc. 37, Amended Complaint.  Skrutski further alleges as a result

of his reporting misconduct he received poor employee performance

evaluations.   Id.  Skrutski claims that the defendants not only

individually violated his rights under the First Amendment but

conspired with each other to do so.

The amended complaint also sets forth, inter alia,

allegations of witness manipulation by Brice and Marut after the

original complaint was filed.  Skrutski alleges that this

violated his First Amendment right of access to the courts.

Pending before the court is a motion for summary

judgment filed by Defendants on July 5, 2005.  The motion became

ripe for disposition on September 1, 2005, when Defendants filed

a reply brief.[3]   Defendants' motion for summary judgment only

addresses Skrutski's First Amendment and conspiracy claims.

## II.   Legal Standard.

The court will consider the motion under the well-known

and accepted standards to be considered in determining whether or

---

3.  This case was reassigned to us on March 20, 2006.

not to grant summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986); Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  Federal Rule of Civil Procedure 56(c) requires that the court render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  If, however, "the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented."  Advisory Committee Notes to Fed. R. Civ. P. 56(e)(1963 Amend.). Furthermore, the evidence and inferences therefrom must be viewed in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. Ltd., 475 U.S. at 585.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corporation, 477 U.S. at 323.  This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial.  Id. at 325.

Rule 56 provides that, where a summary judgment motion is made and properly supported, the adverse party must show by affidavits, pleadings, depositions, answers to interrogatories,

and admissions on file that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of its case that a reasonable judge or jury could find in its favor. Celotex Corporation, 477 U.S. at 322-23.

When addressing a motion for such a judgment, our inquiry focuses on "whether the evidence presents a sufficient disagreement to require [a trial] or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52(emphasis added).

As summarized by the Advisory Committee on Civil Rules, "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Fed. R. Civ. P. 56, Advisory Committee Note to 1963 Amendment. In light of the above legal principles the court will now address the motion for summary judgment filed by Defendants.

III.  The Summary Judgment Record.

The summary judgment record which consists of the amended complaint, the answer to the amended complaint, Defendants' statement of undisputed facts, Skrutski's response to that statement, and numerous deposition transcripts and exhibits submitted by the parties, reveals numerous disputed facts as well as issues of credibility.  Based on a review of the summary

6

judgment record, a jury could find the facts outlined below.

    A.   The Defendants.

    At all relevant times, Defendant Joseph Marut was a captain in the Pennsylvania State Police and was the troop commander of the barracks where Skrutski was employed.  (Pl. Ex. B, Marut Dep. 7-8).   Defendant Michael Brice was the station commander at Gibson beginning in April of 2001.  (Pl. Ex. L, Brice Dep. 8).[4]  Defendant Rebecca S. Warner was a criminal investigator assigned to Troop R, Gibson station.  (Pl. Ex. E, Warner Dep. 9).   Defendant Wanda Gilbert was the criminal investigations section commander at the Dunmore barracks until she retired in June 2004.  (Pl. Ex. C, Gilbert Dep. 9-11).

    B.   Skrutski Reports Brice's Attempt to Falsify
         Investigation.

    In approximately 1994 or 1995, Skrutski was assigned to investigate an accident involving Trooper Holly Storms. (Skrutski Dep. 185).[5]  During the investigation, Brice, then a Corporal, requested that Skrutski falsify the investigation to make it appear as though Storms was intoxicated.  (Skrutski Dep. 186-87).   Skrutski refused, and informed his station commander,

---

4.  Brice was promoted to Lieutenant in or about July of 2004. After being promoted to Lieutenant, he was transferred to Troop R, Honesdale, where he was station commander.  He then requested a transfer to Troop P, Wyoming. As of February 23, 2005, Brice was the "patrol section commander at Troop P in Wyoming."  (Pl. Ex. B, 15-16).

5.  The Skrutski deposition referred to throughout this order is designated on the docket as Document 44, Attachment #1, which was filed July 15, 2005.

Sergeant Joseph Faucet, of Brice's actions.  (Skrutski Dep. 188-89)  Faucet called Brice's commander and relayed the information, and Brice's commander said he would talk to the captain and resolve the situation.  (Skrutski Dep. 190).

Approximately one year later, Brice again contacted Skrutski and requested that he falsify an investigation, this time involving Trooper Sanfillipo. (Skrutski Dep. 191). Skrutski again relayed Brice's actions to Faucet, and Faucet called Brice's supervisor who ensured him that he would resolve the situation.  (Skrutski Dep. 193).  Thereafter, Brice was transferred to a position normally held by a Trooper but remained at the rank of a corporal.  (Skrutski Dep. 193).

C.    Skrutski Reports Trooper Langan's Suspicious
      Activity.

Shortly before Brice assumed command of Gibson in April 2001, Skrutski observed Corporal Langan kneeling beside Trooper William Gross's personal vehicle.  (Skrutski Dep. 27)  Langan held a lug wrench, and had a four way wrench and a tire wrench. (Skrutski Dep. 27)  He heard a metal 'clang' and wondered what Langan was doing.  (Skrutski Dep. 28-29)  He did not inquire further because Langan was the vehicle maintenance officer and could have been fixing the vehicle as a favor.  (Skrutski Dep. 29)  A few days later, Trooper Gross informed Skrutski that someone had flattened his tires several times and on one occasion had loosened his lug nuts.  (Skrutski Dep. 29-30)  Skrutski brought this matter to Sergeant Thomas Pavlick's attention, who

was the station commander at the time.  (Skrutski Dep. 30-31)  He explained what he had witnessed and related Gross's complaint. (Skrutski Dep. 31).   Pavlick took no action, and explained that he would be the station commander for the next three days only, and Skrutski should discuss the matter with Brice when he assumed command.  (Skrutski Dep. 32).  When Skrutski informed Brice of this matter a few days after Brice took command, Brice became irate.  (Id. at 35).  Brice stated that he refused to believe that Langan would do such a thing, Langan is a personal friend of his, and he considered the matter closed.  (Id. at 36).  Skrutski raised the matter with Brice several more times, including during a meeting in May 2001 where Brice again became angry and screamed at Skrutski.  (Id. at 38-39).  Brice told Skrutski that his "career is over" and he would use his influence to ensure that he would never again be promoted.  (Id. at 39).[6]

In the fall of 2002, Brice called Skrutski into his office to discuss the matter again.  (Id. at 42-43).  Brice called Pavlick and asked if he could recall the incident, and Pavlick said he could not.  (Id. at 43-44).  Brice then informed Skrutski that he would take no further action regarding the incident.  (Id. at 45).  Later, when Trooper Gilbert conducted an

_____

6.  Corporal Skrutski testified that "[Brice] became absolutely furious, He started screaming at me. He told me that my career was over, I would never get promoted, I was done.  He said, I have friends all over the department.  I'm going to make a call. You're done. We had a promotional test coming up that summer.  He told me, I was not going to get promoted. . .  He threatened me. He told me my days were numbered.  I better watch my back." (Skrutski Dep. 39).

investigation in 2003 into Skrutski's behavior, Skrutski informed
her of the incident and she took no action although Gross
acknowledged the incident.  (Skrutski Dep. at 52).  Gross
testified that he told both Sergeant Pavlick and Brice about the
incident.  (Pl. Ex. B, 86-88).  Gross also testified that he was
asked about the incident by Lieutenant Gilbert but was never
formally interviewed.  (Id., 88-89).  One of the disciplinary
charges leveled against Corporal Skrutski was that he falsely
accused Corporal Langan of a criminal act.  (Pl. Ex. I).

      D.   Brice Gives Skrutski an Unfavorable Schedule.

      After Brice assumed command of Gibson in April 2001,
Skrutski was scheduled to patrol; thus he was required to perform
the duties of a trooper in addition to performing his supervisory
duties as a corporal.  (Skrutski Dep. 210-11).  From April to
December 2001, he was assigned 100 shifts as a trooper.
(Skrutski Dep.  212).  The three other corporals combined were
not assigned this many trooper shifts.  (Skrutski Dep. 212).

      Brice scheduled Skrutski to work premium holidays,
where pay is double, less frequently than Skrutski had been so
scheduled prior to Brice's arrival.  (Skrutski Dep. 65).
Skrutski requested that he receive two P.M. shifts per week so he
could attend to family matters during the day.  (Skrutski Dep.
132).  Approximately half of the weeks he did not receive the two
P.M. shifts even though he constantly asked Brice.  (Skrutski
Dep. 133-36).

10

E.   Brice Chastises Skrutski.

Brice gave Skrutski an evaluation in the summer of 2001 that had the lowest score Skrutski ever received and one of the lowest he had ever seen of any Pennsylvania State Police employee.  (Skrutski Dep. 129)  Brice also chastised him when he followed regulations and properly secured a weapon that was left unattended in the station by Corporal Langan.  (Skrutski Dep. 131).  Although he was not specifically disciplined as a result of this incident, Brice has consistently given him unfavorable shifts.  (Skrutski Dep. 133-36)

F.   Brice Restrict's Skrutski's Scheduling Authority.

In May 2001, Brice held a counseling session with Skrutski, wherein he informed him that he would no longer be permitted to change, modify, or edit the schedule.  (Skrutski Dep. 55).  Brice made this decision because Skrutski had changed two troopers' work assignments on a shift that he supervised.  (Skrutski Dep. 54).  Skrutski had placed an officer on desk duty because he was injured and was unable to be on the road.  (Skrutski Dep. 55).

G.   Skrutski Questions Brice's Golf Outing.

In October 2001, a clerk informed Skrutski that there was a problem with the schedule for the day.  (Skrutski Dep. 55).  Skrutski explained that he was not permitted to modify the schedule, but the clerk insisted that a decision be made.  (Skrutski Dep. 55).  Skrutski attempted to locate Brice, who was

11

listed on the schedule for a "special assignment," as was Trooper Warner. (Skrutski Dep. 56). Skrutski called Brice's home, and Brice's daughter informed him that Brice was golfing with Captain Marut. (Skrutski Dep. 56). Later, Brice called Skrutski and accused him of improperly investigating him. (Skrutski Dep. 57). Skrutski explained that he merely needed his advice on a scheduling matter, and Brice then directed him on the scheduling matter. (Skrutski Dep. 57). Several days later, Brice sent Skrutski an e-mail to schedule a counseling session with Captain Marut to discuss whether Brice's golf outing was approved. (Skrutski Dep. 58). The meeting, however, never took place and when Skrutski later requested the meeting, Brice refused to allow it. (Skrutski Dep. 59-60). The "special assignment" was a golfing outing attended by Captain Marut, Trooper Warner and Corporal Brice. (Skrutski Dep. 56-58).

H.    Skrutski Questions Brice's Overtime Schedule.

At some unspecified time after Brice took command, Skrutski questioned how Brice apportioned overtime. (Skrutski Dep. 62). Skrutski informed Brice that granting overtime on the basis of personal friendships violated Captain Marut's policy of granting overtime to the most productive officers. (Skrutski Dep. 61-62). Brice told him that Marut was a personal friend and would not object to the manner in which he granted overtime. (Skrutski Dep. 62).

> I.   Skrutski Reports Warner's Improper Investigation
>      and Mobile Logs.

On January 29, 2003, Skrutski assigned a complaint to the criminal investigations unit and Warner felt it was unnecessary for her unit to handle it because they were busy and patrol members were available. (Skrutski Dep. 84-85; Warner Dep. 35). Warner then approached Skrutski and, using profanity and raising her voice, told Skrutski that she would not take the assignment from him and only Lieutenant Gilbert could assign her work. (Skrutski Dep. 84). Skrutski asked her to please interview the complainant, and she left his office to conduct the interview. (Skrutski Dep. 84-85).[7] After Warner submitted her report, Skrutski believed that she should have conducted a more thorough investigation. (Skrutski Dep. 85-87). Corporal Gibser explained that Warner's supervisors in the investigation unit agreed that her investigation was insufficient, and Gibser told

---

7. Skrutski testified that "I was on the phone. I can't remember who I was talking to. But all of sudden I hear Trooper Warner in the barracks. I hear doors slamming. She bursts in my office and slams the door and says, we got to talk. There's no F-ing way I'm taking this. And I was on the phone at this time, and I held my finger up. And she continues to scream at me. Finally, I told the person, hold on one second. I said, what's the matter, Rebecca? And she said, you assigned me this. I said, I didn't assign you anything. The PCO received it, It was a walk in. And she said, well, I'm not going to do it. I don't even get assignments from O'Day. O'Day was Corporal O'Day, her supervisor. The Lieutenant, Lieutenant Gilbert, is the only one that assigns me incidents. And I said, would you, please, just go out and talk to this guy and find out what his problem is. Well, she ranted and raved. She cursed and screamed. Finally, she left my office, slammed the door, and that was the last I heard of it."

Skrutski to inform Warner's supervisor that she filled out the report incorrectly.  (Skrutski Dep. 114).  As a result, on February 10, 2003, Skrutski sent a letter to Michael O'Day, Warner's supervisor, explaining the situation.  (Def. Ex. I, Enclosure 7, 2/10/03 letter; Skrutski Dep. 113-14).

On January 31, 2003, Skrutski issued Warner a correction notice requiring that she complete her mobile unit logs for January 29-30, 2003.  (Skrutski Dep. 93-95; Pl. Ex. G, 1/31/03 Correction Notice).  The log is a record of daily police activity for each officer.  (Skrutski Dep. 93-94).  When Skrutski requested the logs, Warner refused, and on February 3, 2003, she wrote a letter to Skrutski maintaining that it was not her job to complete the log.  (Skrutski Dep. 97; Def. Ex. N, 2/3/03 Warner Letter to Skrutski).  On February 4, 2003, Skrutski issued a supervisor's notation to Warner, explaining that she was required to provide the requested information and failure to do so would result in disciplinary action.  (Skrutski Dep. 100; Pl. Ex. I, 2/4/03 Supervisor's Notice).  On February 10, 2003, Warner responded with another letter explaining that she was not assigned desk duty for January 29 and 30, and thus she was not responsible for generating the reports.  (Skrutski Dep. 101-02; Pl. Ex. J, 2/10/03 Warner Letter to Skrutski).  Furthermore, she did not leave the station during those days with an assigned vehicle, and therefore a mobile log could not have been generated.  (Skrutski Dep. 101-02; Pl. Ex. J, 2/10/03 Warner Letter to Skrutski).  Skrutski still disagreed and believed that

14

she had left that station for some period of time, and
regardless, was required to provide the appropriate information.
(Skrutski Dep. 101-04).[8]

At some undisclosed time thereafter, Brice called
Skrutski into his office to discuss the recent incidents with
Warner.  (Skrutski Dep. 116).  He explained that Warner had
approached the captain, and they had to be careful because she
had a "unique" relationship with Marut.  (Skrutski Dep. 116).
Thus, he requested that Skrutski provide all documentation of the
recent incidents with Warner.  (Skrutski Dep. 116-17).  Skrutski

---

8. Corporal Skrutski explained his disagreement with Trooper
Warner as follows:

> Susquehanna County is almost 900 square miles. If you
> got an incident anywhere in Susquehanna County, you're
> going to need a car. . . . When you're working, you
> get a car, you load your equipment in it, and if
> you're assigned an incident, you get in the car and
> you're all ready to go.  That's - that's pretty much
> police [Standard Operating Procedure] commonsense.
> She was working on both those days.  She was on
> station.  She was doing reports.  What she should
> have done was, after she went in service
> and came on station, she should have went out to the
> [Police Communications Officer] and provided incident
> numbers of the reports that she was working on so
> the PCO could write them in the communications log in
> case there was any question what she was doing or what
> she was working on, that would be in there.
> That's right per the regulations.  This isn't my
> requirement.  This is what the regulations – in fact,
> the inspection that Gibson station went through, the
> command inspections, commonly referred to the
> Beetles inspection, which Lieutenant Brice –
> I'm sorry - Sergeant Brice at the time was the
> station commander.  Part of the reason they
> failed was because these logs were not being
> kept accurate and they were not reflecting
> activities of the troopers.

(Skrutski Dep. 95-96).

complied, and provided him with the correction notice, the
supervisor's notation, and the documents concerning the credit
card fraud investigation.  (Skrutski Dep. 117).  Brice was
concerned that Warner's response to Skrutski's request for the
mobile logs was insubordinate, and he supported Skrutski's
decision to issue the correction notice and supervisor's
notation.  (Skrutski Dep. 117-18).  He reiterated that he had to
be careful because of Warner's relationship with Captain Marut.
(Skrutski Dep. 118).  Brice instructed Corporal Langan to take
the logs to Warner and require that she complete them as Skrutski
requested.  (Skrutski Dep. 118-19).  He reassured Skrutski that
he had done nothing wrong.  (Skrutski Dep. 119).

> J.    Temporary Transfer.

On February 25, 2003, Skrutski was instructed to report
to Captain Marut's office, and he complied.  (Skrutski Dep. 120).
Marut informed him that he was transferred to Honesdale
immediately when he walked into the office.  (Skrutski Dep. 120,
123).  Marut explained that he did not have a lot of details but
he knew Defendant Warner intended to file a complaint and
Skrutski would be transferred pending the complaint.  (Skrutski
Dep. 120).  Marut then offered to end the matter if Skrutski
would take a voluntary transfer to Honesdale.  (Skrutski Dep.
121).  Skrutski said he would agree to a voluntary transfer to
Dunmore but not Honesdale.  (Skrutski Dep. 122).  Dunmore was
more convenient for Skrutski than either Honesdale or Gibson.
(Skrutski Dep. 122).

Skrutski's responsibilities at Honesdale were identical to those at Gibson. (Skrutski Dep. 15-16). His pay was not reduced, although he may have received more overtime pay had he stayed at Gibson because of construction projections at Gibson that year. (Skrutski Dep. 18). Honesdale is twenty to twenty three miles from his home, and Gibson is approximately thirty. (Skrutski Dep. 18). Additionally, Skrutski was placed on restricted duty status. (Skrutski Dep. 147).

K.  Marut's Relationship with Warner.

Marut and Warner were very close and intimate friends. (Pl. Ex. P., Storms Dep. 154-160). At a social function involving a number of Pennsylvania State Police personnel, Marut and Warner were observed slow dancing. Sergeant Storm testified that "[t]hey were body to body. I saw trooper Warner put her head down on the Captain's chest or shoulder area." Id. Sergeant Storm heard individuals state that they observed Trooper Warner sitting on Captain Marut's lap. Id. Trooper Mark Prushinski overheard Trooper Warner and Captain Marut engage in intimate conversation. Trooper Prushinski stated as follows: "I was at the last Camp Cadet Golf Tournament held at the Panorama Golf Course. (Possibly June 2001) After the Tournament was over, I was standing near the bar area and heard Cpt Joseph MARUT speaking to Tpr Rebecca WARNER. To my amazement I heard the two discussing 'the benefits of a big cock' I couldn't believe my ears and felt strange so I walked away. I didn't hear any other details but they sat at the bar and the conversation continued." (Pl. Ex.

17

H).   Trooper Warner and Captain Marut attended a golfing outing
in the State of New York. (Pl. Ex. E, Warner Dep. 21-22)   Trooper
Warner drove her personal vehicle and Captain Marut was a
passenger. (Id.).   Trooper Warner and Captain Marut would attend
Pennsylvania State Police golf tournaments. (Pl. Ex. F, Marut
Dep. 12-13).   At these tournaments, Captain Marut would greet
Trooper Warner with a hug and a kiss on the cheek "and sometimes
on the lips." (Id.)

     L.   Gilbert's Relationship with Warner.

     Defendant Gilbert was a Lieutenant under Marut's
command. (Pl. Ex. C., Gilbert's Dep. 11).   Trooper Rebecca Warner
was one of Lieutenant Gilbert's criminal investigators. (Id. 15).
Lieutenant Gilbert has visited Trooper Warner's home and has
stayed overnight at her home on at least one occasion.   (Id. 19).
Lieutenant Gilbert had what can be "generally described as a
personal friendship with [Trooper Warner]." (Id. 20).

     M.   Gilbert's Investigation.

     When Warner made a complaint against Skrutski, Marut
assigned Gilbert as the investigator.   (Skrutski Dep. 20-21).
Warner never formally filed a written complaint outlining her
claims of harassment.   (Pl. Ex. C, Gilbert Dep. 72).    It is
Skrutski's opinion that Marut should have known that Gilbert was
a personal friend of Warner's and assigned a different
investigator.   (Skrutski Dep. 21).    He also believes that Marut
was a personal friend of Warner's, and he should have recused
himself as the adjudicator.   (Skrutski Dep. 21-22).   As part of

the investigation, Gilbert called Skrutski on numerous occasions, she interviewed him at Honesdale once, and then she held a formal interview sometime in the spring of 2003.  (Skrutski Dep. 142).

Although the investigation was centered on the charge that Skrutski harassed Warner, it was broadened to uncover incidents within the last fifteen years of Skrutski's career relating to his treatment of troopers in general.  (Skrutski Dep. 143).  The investigation uncovered a litany of allegations that Skrutski yelled at coworkers and was mean.  (Skrutski Dep. 143).  Skrutski believes that he will never receive a promotion because of the investigation.  (Skrutski Dep. 143).

During the investigation, Lieutenant Gilbert interviewed 30 individuals.  (Pl. Ex. C, Gilbert Dep. 56).  Lieutenant Gilbert testified "that the complaint was not strictly over [Skrutski] ordering [Warner] to do a report." (Id., 64).  She further testified that it related to "a hostile work environment." (Id.).  No evidence was developed during Lieutenant Gilbert's investigation that Skrutski engaged in quid pro quo sexual harassment or treated Warner differently because of her gender. (Pl. Ex. I).  Warner never told Lieutenant Gilbert that "she was having some physical ailments as a result of stress" caused by Skrutski. (Pl. Ex. C, Gilbert Dep. 82).  One of the charges leveled against Skrutski was that he "specifically targeted and created a hostile work environment for Tpr. Rebecca S. Warner, to the point that she became physically ill."  (Pl. Ex. I).  Of the 30 individuals interviewed by Lieutenant Gilbert

only three allegedly stated "they were stressfully affected by
working around Trooper Skrutski." (Id., 83)

One of those individuals was Trooper Mark Mulvey. (Id.
Enclosure 4). Gilbert reported that Skrutski's behavior caused
Trooper Mark Mulvey to have stress induced nose-bleeds. (Id.)
Specifically, Gilbert's interview summary states in relevant part
as follows:

> When asked if he had any knowledge of anyone within
> the Department whom he knew had suffered anxiety
> or physical ailments as a result of worrying about
> having to work shifts with Corporal SKRUTSKI,
> MULVEY replied, "Aside from myself, not anyone
> who is here anymore. There's John MINALDA but
> he's transferred. When all this was going on with
> me, the Tweety thing, I used to hate to come to
> work when I knew I was going to have to be working
> with him, for him. My blood pressure was through
> the roof. For God's sake, I was having spontaneous
> nosebleeds. My personal opinion, I think this was
> left to go on too long. He should've had his reins
> pulled in five, six years ago."

(Id.) Trooper Mulvey has submitted a statement which indicates
in pertinent part as follows: "I never stated that Cpl Skrutski
caused me to have nosebleeds." (Pl. Ex. K). Trooper Mulvey also
testified at an arbitration hearing involving the Pennsylvania
State Troopers Association on February 23, 2005, as follows:

> Q. In your 12 years at Gibson, did you have an
> opportunity to be supervised in the patrol unit by
> Cpl. Skrutski?
>
> A. Yes, I did.
>
> Q. And there had been – there's been an allegation
> raised that there was an occasion on which you
> developed a nosebleed and attributed it to stress
> caused by Cpl. Skrutski's supervision.
>
> A. That's incorrect.

Q.  That is incorrect?

A.  Yes, it is.

\*    \*    \*    \*    \*    \*    \*

Q.  And did there come a time thereafter that you were interviewed in a BPR[9] investigation?

A. Yes.

Q.  Okay.  And was that with respect to Cpl. Skrutski?

A.  Yes, it was.

Q.  And during that interview, did the BPR investigator, Lt. Gilbert, ask you if there had been any relationship between Cpl. Skrutski's supervision and your nose bleeds?

A.  Yes, she did.  The exact quote was, she asked if Cpl. Skrutski had caused me to have any medical problems and I stated, not, he did not.  And she then stated to me, come on, Mark, I know you had nosebleeds because of Cpl. Skrutski.

Q. Okay. Did you say to her, my blood pressure was going through the roof.  For god's sake, I was having spontaneous nosebleeds in response to Cpl Skrutski's supervision?

A.  No, I did not.

Q. Okay.  Afterwards, did there come a time that you became aware that Lt. Gilbert had attributed those statements to you?

A.  When I received my letter of the interview that was conducted between her and myself: when she interviewed me.  I saw what she had written on paper.

Q.  And what was your reaction?

A.  Shocked.

Q.  Why were you shocked?

---

9.  We assume that "BPR" stands for Bureau of Professional Responsibility or Board of Professional Responsibility.

A.  Because I never attributed my nosebleeds to
Cpl. Skrutski.

Q.  And she said that you did?

A.  Yes, she did.

(Pl. Ex. B, pages 73-75).

During a pre-discipline meeting in June 2003, Skrutski
informed Marut that he believed that Gilbert's investigation was
unduly thorough and investigating events that occurred up to
fifteen years earlier was unnecessary.  (Skrutski Dep. 72)  He
informed Gilbert during the course of her investigation that it
was inappropriate for her to investigate the complaint.
(Skrutski Dep. 72).

N.    Results of Investigation.

On June 23, 2003, Marut issued a disciplinary action
report summarizing the results of the investigation and warning
that the report could result in discipline, including transfer.
(Pl. Ex. I; Disciplinary Action Report, 6/23/03).  After
receiving the report, Skrutski consulted with his union and as
per its instruction he filed a grievance.  (Skrutski Dep 145-48).
Apparently, there has been no resolution of that grievance.

In the fall of 2003, Lieutenant Gryzboski handed
Skrutski his discipline.  (Skrutski Dep. 144).  None of the
defendants had the authority to issue the final discipline, which
was administered by Department of Discipline Officers Lt. Karl
Harrison and Captain Robert Titler.  (Pl. Counterstatement of
Mat. Facts ¶ 41).  Skrutski received thirty-five days without pay
and was assigned to Troop T turnpike, which is the only troop in

the Pennsylvania State Police without a Special Emergency
Response Team program.  (Skrutski Dep. 144).  He no longer had
access to a state car.  (Skrutski Dep. 144).  Skrutski had been a
member of the Special Emergency Response Team since February
1992. (Skrutski Dep. 16).

O.   Brice's Post-Complaint Actions.

After Skrutski filed the instant complaint, Brice
informed Trooper Holly Storms that the investigation into Storms'
accident that occurred in 1994 or 1995 was somehow related to
Skrutski's lawsuit.  (Pl. Ex. P. Storms Dep. 89-92).  Brice told
Storms that Skrutski had alleged that Brice attempted to cover up
her drinking.  (Storms Dep. 89-92). As noted in section B above,
Skrutski had reported that Brice had requested Strutski that he
falsify the investigation to make it appear as though Storms was
intoxicated.

IV.  Discussion.

A First Amendment retaliation claim requires a
plaintiff to prove the following three elements: (1) that the
plaintiff engaged in protected First Amendment activity; (2) the
government responded with retaliation; and (3) the protected
activity was the cause of the government's retaliation.  Anderson
v. Davila, 125 F.3d 148, 161 (3d Cir. 1997).  For purposes of the
summary judgment motion, Defendants have conceded that Skrutski
engaged in activity protected by the First Amendment.  The
question presented is whether there are triable issues of

material fact in dispute with respect to the second and third elements of the claim.

As for the conspiracy claim, in order to establish such a claim, a plaintiff cannot rely on broad or conclusory allegations. <u>D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.</u>, 972 F.2d 1364, 1377 (3d Cir. 1992) cert. denied, 506 U.S. 1079 (1993); <u>Rose v. Bartle</u>, 871 F2d 331, 366 (3d Cir. 1989); <u>Durre v. Dempsey</u>, 869 F.2d 543, 545 (10th Cir. 1989). The Court of Appeals for this circuit has further noted that "[a] conspiracy claim must . . . contain supportive factual allegations." <u>Rose</u>, 871 F.2d at 366. Moreover, "[t]o plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." <u>Shearin v. E.F. Hutton Group, Inc.</u>, 885 F.2d 1162, 1166 (3d Cir. 1989).

The essence of a conspiracy is an agreement or concerted action between individuals. <u>See</u> <u>D.R. by L.R.</u>, 972 F.2d at 1377; <u>Durre</u>, 869 F.2d at 545. Consequently, in an action such as this one, a plaintiff must allege with particularity and present material facts which show that the purported conspirators reached some understanding or agreement or plotted, planned and conspired together to deprive plaintiff of a protected federal right. <u>Id.</u>; <u>Rose</u>, 871 F.2d at 366; <u>Young</u>, 926 F.2d at 1405 n.16; <u>Chicarelli v. Plymouth Garden Apartments</u>, 551 F. Supp. 532, 539 (E.D. Pa. 1982). A civil rights conspiracy claim must be

24

supported by some evidence which tends to show a meeting of the minds and some type of concerted activity.  Deck v. Leftridge, 771 F.2d 1168, 1170 (8th Cir. 1985).  A plaintiff cannot rely on subjective suspicions and unsupported speculation.  Young v. Kann, 926 F2d 1396, 1405 n.16 (3d Cir. 1991).

The elements of Skrutski's conspiracy claim, as well as his First Amendment retaliation claim, can be established by way of direct or circumstantial evidence.

In ruling on this motion for summary judgment, the evidence and inferences therefrom must be viewed in a light most favorable to Skrutski.  There is evidence which suggests that Captain Marut, Trooper Warner and Lieutenant Gilbert were close personal friends and they along with Sergeant Brice engaged in concerted activity to retaliate against Skrutski for exercising his First Amendment rights.  There is evidence from which a jury could conclude that Sergeant Brice was a close friend of Captain Marut and that Brice and Captain Marut had a motive to retaliate against Corporal Skrutski.  There is evidence suggesting that the investigation by Lieutenant Gilbert was biased and went far beyond the initial allegations made by Trooper Warner. Furthermore, Lieutenant Gilbert may  have misrepresented what Trooper Mulvey told her regarding his interactions with Corporal Skrutski.  There are numerous disputed facts and credibility issues that cannot be resolved at this stage.  Based on our review of the summary judgment record as outlined above, we cannot conclude that the Defendants are entitled to judgment as a

matter of law on Skrutski's First Amendment retaliation and conspiracy claims.

Defendants have also asserted that they are entitled to qualified immunity because the law was not "clear that transferring an employee due to sexual harassment complaints or doing a very thorough internal investigation constitutes a violation of that employee's First Amendment rights." Doc. 44, Brief in Support, page 10.   Defendant's argument regarding immunity "begs the question."  The law is clear that a public official may not retaliate against an employee for the exercise of the employee's First Amendment rights.  There is evidence suggesting that there were impermissible reasons for the action taken against Skrutski and that the harassment charges were a pretext.  There are numerous triable issues of material fact as set forth above.  Defendants' motion for summary judgment with respect to the First Amendment retaliation and conspiracy claims will be denied.

An appropriate order will be entered.


                                        s/Malcolm Muir_____
                                        MUIR, U.S. District Judge




Dated: March 29, 2006

MM:gs

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS C. SKRUTSKI,                        :
                                           :
            Plaintiff                      :   No. 3:CV-03-2280
                                           :
            v.                             :   Complaint Filed 12/15/03
                                           :
JOSEPH MARUT, MICHAEL L. BRICE,  :   (Judge Muir)
REBECCA S. WARNER AND WANDA        :
GILBERT,                                   :
                                           :
            Defendants                     :


ORDER

March 29, 2006


        1.  Defendants' motion for summary judgment (Doc. 42)

is denied.

        2.  This case is placed on the July, 2006, trial list.

        3.  A pretrial conference will be held on June 1, 2006,

at a time to be announced.

        4.  A settlement conference will be held on April 28,

2006, at a time to be announced.


                            s/Malcolm Muir_____
                            MUIR, U.S. District Judge


27