IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS C. SKRUTSKI,                  :
                                     :
            Plaintiff                :   No. 3:CV-03-2280
                                     :
            v.                       :   Complaint Filed 12/15/03
                                     :
JOSEPH MARUT, MICHAEL L. BRICE,      :   (Judge Muir)
REBECCA S. WARNER AND WANDA          :
GILBERT,                             :
                                     :
            Defendants               :

OPINION

MUIR, District Judge.

I.   Introduction.

        On December 15, 2003, Plaintiff Thomas C. Skrutski, a
Corporal with the Pennsylvania State Police, filed a civil rights
complaint pursuant to 42 U.S.C. § 1983 against four other
individuals employed by the Pennsylvania State Police.  On April
15, 2005, Skrutski filed an amended complaint.  Named as
defendants in the amended complaint are the following
individuals: (1) Joseph Marut, who at the time of the filing of
the amended complaint was a Captain with the Pennsylvania State
Police;[1] (2) Michael L. Brice, who is the station commander at
the Gibson State Police barracks; (3) Rebecca S. Warner, a
criminal investigator with the Pennsylvania State Police; and (4)
Wanda Gilbert, who was a Lieutenant with the Pennsylvania State
Police.[2]

_____

1.  Marut has been promoted to Major effective July 30, 2005, and
mantains an office at the Wyoming Station as Area II Commander.

2.  Gilbert is no longer employed by the Pennsylvania State
Police.

Skrutski claims that the Defendants individually violated his rights under the First and Fourteenth Amendments to the United States Constitution and that they conspired to do so. The First Amendment claims are premised on allegations that the Defendants retaliated against Skrutski for speaking out on matters of public concern.  The Fourteenth Amendment claim is based on a contention that Skrutski was denied substantive and procedural due process and equal protection of the law as a result of being subjected to arbitrary and capricious conduct by the Defendants relating to employee discipline and a standard different from that which was applied to other Pennsylvania State Police officers.

On July 5, 2005, Defendants filed a motion for summary judgment.  Defendants' motion for summary judgment only addressed part of Skrutski's First Amendment retaliation claim and his conspiracy claim. It did not address Skrutski's due process and equal protection claims and at least two aspects of his First Amendment claim.  The two aspects of the First Amendment claim not addressed in the motion for summary judgment were Skrutski's contention that (1) he was retaliated against when Defendants allegedly intimidated or interfered with witnesses and (2) he was denied access to the courts. This case was reassigned to us on March 20, 2006.  On March 29, 2006, we issued an order denying the motion and the case was placed on the July, 2006, trial list,

On June 14, 2006, Defendants filed a motion in limine relating, inter alia, to "any testimony of 'wrongdoing' involving

2

the official job responsibilities, i.e., Skrutski's allegations of unfavorable scheduling, unfair investigation, and unfair evaluations."   The motion in limine primarily relied on the recent United States Supreme Court case of <u>Garcetti v. Ceballos</u>, ____U.S.___, 126 S.Ct. 1951 (2006).   In that case the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Id.</u>, at 1960.

A First Amendment retaliation claim requires a plaintiff to prove the following three elements: (1) that the plaintiff engaged in protected First Amendment activity; (2) the government responded with retaliation; and (3) the protected activity was the cause of the government's retaliation. <u>Anderson v. Davila</u>, 125 F.3d 148, 161 (3d Cir. 1997).   For purposes of the summary judgment motion, Defendants conceded that Skrutski engaged in activity protected by the First Amendment.   The motion in limine related to evidence which allegedly would establish that Skrutski engaged in First Amendment protected activity, i.e,, the first element of a First Amendment retaliation claim which Skrutski is required to prove.   By order of June 16, 2006, we converted the motion in limine to a second motion for summary judgment and required supplemental briefing.   We also continued the trial sine die.   The second motion for summary judgment became ripe for disposition on September 5, 2006.

3

II.   Legal Standard.

The court will consider the second motion for summary judgment under the well-known and accepted standards to be considered in determining whether or not to grant summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986); Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  Federal Rule of Civil Procedure 56(c) requires that the court render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  If, however, "the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented."  Advisory Committee Notes to Fed. R. Civ. P. 56(e)(1963 Amend.).  Furthermore, the evidence and inferences therefrom must be viewed in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. Ltd., 475 U.S. at 585.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corporation, 477 U.S. at 323.  This may be met by the moving party pointing out to the court that there is an absence

of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial.  Id. at 325.

Rule 56 provides that, where a summary judgment motion is made and properly supported, the adverse party must show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of its case that a reasonable judge or jury could find in its favor. Celotex Corporation, 477 U.S. at 322-23.

When addressing a motion for such a judgment, our inquiry focuses on "whether the evidence presents a sufficient disagreement to require [a trial] or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52(emphasis added).

As summarized by the Advisory Committee on Civil Rules, "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56, Advisory Committee Note to 1963 Amendment. In light of the above legal principles the court will now address the second motion for summary judgment.

III.   Summary Judgment Record.

In the amended complaint Skrutski alleges that his rights under the First Amendment to the United States Constitution were violated when he was retaliated against for reporting violations of State Police regulations and possible criminal acts by other individuals employed by the State Police. He contends the retaliation took the form, inter alia, of improper discipline, reassignment and the intimidation of witnesses.  He also contends that Defendants violated his First Amendment right to petition the government (the filing the original civil complaint in federal court) by engaging in certain acts of retaliation which will be detailed below.  The Plaintiff also raised a First Amendment access to the courts claim and claims under the Fourteenth Amendment.

In our opinion of March 29, 2006, we stated that our review of the summary judgment record revealed numerous disputed facts.  We then after viewing the record in a light most favorable to Skrutski set forth the facts that a jury could find. Of those facts, we will now outline the most pertinent to our disposition of the second motion for summary judgment.

In approximately 1994 or 1995, Skrutski was assigned to investigate an accident involving Trooper Holly Storms. (Skrutski Dep. 185).[3]  During the investigation, Brice, then a Corporal, requested that Skrutski falsify the investigation to

---

3.  The Skrutski deposition referred to throughout this opinion is designated on the docket as Document 44, Attachment #1, which was filed July 15, 2005.

make it appear as though Storms was intoxicated.  (Skrutski Dep. 186-87).  Skrutski refused, and informed his station commander, Sergeant Joseph Faucet, of Brice's actions.  (Skrutski Dep. 188-89)  Faucet called Brice's commander and relayed the information, and Brice's commander said he would talk to the captain and resolve the situation.  (Skrutski Dep. 190).

Approximately one year later, Brice again contacted Skrutski and requested that he falsify an investigation, this time involving Trooper Sanfillipo. (Skrutski Dep. 191). Skrutski again relayed Brice's actions to Faucet, and Faucet called Brice's supervisor who ensured him that he would resolve the situation.  (Skrutski Dep. 193).  Thereafter, Brice was transferred to a position normally held by a Trooper but remained at the rank of a corporal.  (Skrutski Dep. 193).

Shortly before Brice assumed command of the Gibson barracks in April 2001, Skrutski observed Corporal Langan kneeling beside Trooper William Gross's personal vehicle. (Skrutski Dep. 27)  Langan held a lug wrench, and had a four way wrench and a tire wrench.  (Skrutski Dep. 27)  He heard a metal 'clang' and wondered what Langan was doing.  (Skrutski Dep. 28-29)  He did not inquire further because Langan was the vehicle maintenance officer and could have been fixing the vehicle as a favor.  (Skrutski Dep. 29)  A few days later, Trooper Gross informed Skrutski that someone had flattened his tires several times and on one occasion had loosened his lug nuts.  (Skrutski Dep. 29-30)  Skrutski brought this matter to Sergeant Thomas

7

Pavlick's attention who was the station commander at the time.
(Skrutski Dep. 30-31)  He explained what he had witnessed and
related Gross's complaint.  (Skrutski Dep. 31).  Pavlick took no
action, and explained that he would be the station commander for
the next three days only, and Skrutski should discuss the matter
with Brice when he assumed command.  (Skrutski Dep. 32).  When
Skrutski informed Brice of this matter a few days after Brice
took command, Brice became irate.  (Id. at 35).  Brice stated
that he could not believe that Langan would do such a thing, that
Langan was a personal friend of his, and he considered the matter
closed.  (Id. at 36).  Skrutski raised the matter with Brice
several more times, including during a meeting in May 2001 where
Brice again became angry and screamed at Skrutski.  (Id. at 38-
39).  Brice told Skrutski that his "career is over" and he would
use his influence to ensure that he would never again be
promoted. (Id. at 39).[4]

     In the fall of 2002, Brice called Skrutski into his
office to discuss the matter again.  (Id. at 42-43).  Brice
called Pavlick and asked if he could recall the incident, and
Pavlick said he could not.  (Id. at 43-44).  Brice then informed
Skrutski that he would take no further action regarding the

---

4.  Corporal Skrutski testified that "[Brice] became absolutely
furious, He started screaming at me. He told me that my career
was over, I would never get promoted, I was done.  He said, I
have friends all over the department.  I'm going to make a call.
You're done. We had a promotional test coming up that summer.  He
told me, I was not going to get promoted. . .  He threatened me.
He told me my days were numbered.  I better watch my back."
(Skrutski Dep. 39).

incident.  (Id. at 45).  Later, when Defendant Gilbert conducted
an investigation in 2003 into Skrutski's behavior, Skrutski
informed her of the incident and she took no action although
Gross acknowledged the incident.  (Skrutski Dep. at 52). Gross
testified that he told both Sergeant Pavlick and Brice about the
incident.  (Pl. Ex. B, 86-88).  Gross also testified that he was
asked about the incident by Gilbert but was never formally
interviewed.  (Id., 88-89).  One of the disciplinary charges
leveled against Corporal Skrutski was that he falsely accused
Corporal Langan of a criminal act. (Pl. Ex. I).

     After Brice assumed command of the Gibson barracks in
April 2001, Brice gave Skrutski an unfavorable schedule.
(Skrutski Dep. 65, 133-36 and 210-12).  In the summer of 2001
Brice gave Skrutski an evaluation that reflected the lowest score
Skrutski ever received and one of the lowest he had ever seen of
any Pennsylvania State Police employee.  (Skrutski Dep. 129)
Brice also chastised Skrutski when he followed regulations and
properly secured a weapon that was left unattended in the station
by Corporal Langan.  (Skrutski Dep. 131).

     On January 29, 2003, Skrutski assigned a complaint to
the criminal investigations unit and Defendant Warner felt it was
unnecessary for her unit to handle it because they were busy and
patrol members were available.  (Skrutski Dep. 84-85; Warner Dep.
35).  Warner then approached Skrutski and, using profanity and
raising her voice, told Skrutski that she would not take the
assignment from him and only Gilbert could assign her work.

(Skrutski Dep. 84).   Skrutski asked her to please interview the complainant and she left his office to conduct the interview. (Skrutski Dep. 84-85).[5]  Warner submitted her report and Skrutski believed that she should have conducted a more thorough investigation. (Skrutski Dep. 85-87)

On February 25, 2003, Skrutski was instructed to report to Captain Marut's office, and he complied.  (Skrutski Dep. 120). Marut informed him that he was being transferred to Honesdale immediately when he walked into the office.  (Skrutski Dep. 120, 123).  Marut explained that he did not have a lot of details but he knew Defendant Warner intended to file a complaint and Skrutski would be transferred pending the complaint.  (Skrutski Dep. 120).  Marut then offered to end the matter if Skrutski would take a voluntary transfer to Honesdale.  (Skrutski Dep. 121).  Skrutski said he would agree to a voluntary transfer to Dunmore but not Honesdale.  (Skrutski Dep. 122).  Dunmore was

---

5.  Skrutski testified that "I was on the phone.  I can't remember who I was talking to.  But all of sudden I hear Trooper Warner in the barracks.  I hear doors slamming.  She bursts in my office and slams the door and says, we got to talk.  There's no F-ing way I'm taking this.  And I was on the phone at this time, and I held my finger up.  And she continues to scream at me. Finally, I told the person, hold on one second.  I said, what's the matter, Rebecca?  And she said, you assigned me this.  I said, I didn't assign you anything. The PCO received it, It was a walk in.  And she said, well, I'm not going to do it.  I don't even get assignments from O'Day. O'Day was Corporal O'Day, her supervisor.  The Lieutenant, Lieutenant Gilbert, is the only one that assigns me incidents.  And I said, would you, please, just go out and talk to this guy and find out what his problem is. Well, she ranted and raved. She cursed and screamed.  Finally, she left my office, slammed the door, and that was the last I heard of it."

more convenient for Skrutski than either Honesdale or Gibson. (Skrutski Dep. 122).

A lengthy investigation was than initiated which was conducted by Defendant Gilbert.  We have outlined in our opinion of March 29, 2006, the alleged close personal relationship of Marut, Warner, Gilbert and Brice, and the scope and extent of Gilbert's investigation, including some of the alleged improper conduct of Gilbert,[6]

On June 23, 2003, Marut issued a disciplinary action report summarizing the results of the investigation and warning that the report could result in discipline, including transfer. (Pl. Ex. I; Disciplinary Action Report, 6/23/03).  After receiving the report, Skrutski consulted with his union and as pursuant to its instruction filed a grievance.  (Skrutski Dep 145-48).    In the fall of 2003, Lieutenant Gryzboski handed Skrutski his discipline.  (Skrutski Dep. 144).  None of the defendants had the authority to issue the final discipline, which was administered by Department of Discipline Officers Lt. Karl Harrison and Captain Robert Titler.  (Pl. Counterstatement of Mat. Facts ¶ 41).  Skrutski received thirty-five days without pay

_____

6. Although the investigation was centered on the charge that Skrutski harassed Warner, it was broadened to uncover incidents within the last 15 years of Skrutski's career relating to troopers in general.  During the investigation, Defendant Gilbert interviewed 30 individuals.  Of the 30 individuals interviewed by Defendant Gilbert only three allegedly stated they were stressfully affected by working around Trooper Skrutski. One of those individuals was Trooper Mark Mulvey.  Gilbert reported that Skrutski's behavior caused Trooper Mulvey to have stress induced nose-bleeds.  Trooper Mulvey, however, has reported that he never made a statement to that effect.

and was assigned to Troop T turnpike, which is the only troop in the Pennsylvania State Police without a Special Emergency Response Team program.  (Skrutski Dep. 144).  He no longer had access to a state car.  (Skrutski Dep. 144).  Skrutski had been a member of the Special Emergency Response Team since February 1992. (Skrutski Dep. 16).

After Skrutski filed the instant complaint, Brice informed Trooper Holly Storms that the investigation into Storms' accident that occurred in 1994 or 1995 was somehow related to Skrutski's lawsuit.  (Pl. Ex. P. Storms Dep. 89-92).  Brice told Storms that Skrutski had alleged that Brice attempted to cover up her drinking.  (Storms Dep. 89-92). As noted above, Skrutski had reported that Brice had requested Skrutski that he falsify the investigation to make it appear as though Storms were intoxicated.

IV.   Supplemental Evidentiary Material Submitted in Support of and in Opposition to the Second Motion for Summary Judgment.

In support of the second motion for summary judgment Defendants have submitted an affidavit from Sidney A. Simon, the Deputy Commissioner of Administration of the Pennsylvania State Police, outlining Skrutski's job duties and several State Police Field Regulations.  That affidavit states in relevant part as follows:

4. . . . In 2001, Plaintiff Thomas Skrutski was employed by the Pennsylvania State Police ("PSP") as a corporal, patrol section supervisor at the Gibson barracks.

12

5.   Skrutski's job responsibilities as a patrol corporal included supervision of subordinates by assigning work, developing and communicating expectations for work assignments and duties, monitoring work, providing feedback, documenting performance, handling problems, and holding meetings. The position is responsible for supervising and providing guidance to Troopers, and performing other enforcement and oversight duties in the patrol unit as assigned.

6.   In addition to these responsibilities, Skrutski is required to adhere to the Field Regulations and Administrative Regulations of the State Police.

7. Field Regulation 1-1, 1.17A requires that members shall report to their supervisor all information that comes to their attention concerning organized crime, racketeering, vice conditions, or violations of any laws concerning such activities.

8.   Field Regulation 1.17B requires that members shall promptly report to their supervisor any information which comes to their attention and which tends to indicate that any other member or employee has violated any law, rule, regulation or order.

9.   As a result of the litigation and my prior assignment, I have become familiar with the issues that Skrutski claims he reported to his supervisor.

10. Pursuant to FR 1.17, Skrutski was required, as part of his official job duties as a member of the PSP to report Langan's suspicious activity to his supervisor.

11.   Pursuant to FR 1.17, Skrutski was required, as part of his official job duties, to report Brice's attempts to falsify investigations.

12.   Pursuant to the job description for a corporal, Skrutski was required as part of his official job duties to supervise, guide and if necessary, reprimand troopers, including Trooper Warner.

Doc. 89, Defendants' Supplemental Brief in Support of Their Motion for Summary Judgment, Exhibit A.

Also, Skrutski has submitted an affidavit in opposition to the second motion for summary judgment.  That affidavit states in relevant part as follows:

> 2. I am employed by the Pa State Police as a Patrol or Traffic Corporal and not as an Internal Affairs Investigator.  As such, I have no official job requirement to ferret out, investigate, and prosecute criminal or other wrongdoing within the rank and file of the State Police.  My official duties are to supervise patrol troopers from the Honesdale station in the performance of their patrol-related duties in and around Wayne County.

> 3.  I have had many conversations with superiors, subordinates, and peers throughout the years, to include the defendants, about wrongdoing within the State Police organization, all as a citizen and employee concerned for the integrity of the provision of public services, and not because I was required by any Administrative Regulations or Field Regulations to do so.  These conversations were not part of my official duties, but were engaged in by me as a concerned employee and citizen.

> 4.  In or around 1994-95, I talked to supervisors about Defendant Brice's attempted involvement in a pattern of falsifying police reports and how Brice wanted me to assist his efforts.  I discussed this matter with Sgt. Joseph Fawcett, who was Gibson Station Commander and my mentor, about how Brice wanted me to falsify reports.  I never prepared nor was requested by anyone in the State Police to prepare any type of official communication in this matter.  After these initial conversations in 1994-95, the matter was never again brought up by anyone in the State Police.  In 1995, Trooper Frank Sanfillipo, a subordinate of Brice, was involved in an off-duty incident of fleeing and eluding from several local police officers.  Brice attempted to use his badge of office to convince the local officers not to arrest Sanfillipo and attempted to have me coerce the local police as well.  I spoke to the local officers as a concerned citizen and warned them not to listen to Brice but to do the right thing.

> 5.  In or around March of 2001, I witnessed Langan kneeling down beside a vehicle with a wrench in his hand. This did not seem odd to me since Langan was a Vehicle Maintenance Officer.  At the time that I

14

witnessed this activity, I did not think that any
misconduct was taking place on anyone's part,
especially since Langan seemed to be such a nice
person.

6.   After hearing some rumors about damage to
Trooper Gross's vehicle, I told Pavlick about what
I had observed.   At that time, I still was not
aware if there was any misconduct on Langan's
part or if Langan was doing maintenance on or near
the vehicle.   I merely mentioned the incident to
Pavlick casually as a concerned citizen.   Pavlick
told me to tell Michael Brice, who was going to be
replacing him, what I observed.

7.   I talked to Brice about my observations . . .
Brice reprimanded me . . . saying Langan was a
close, personal friend and that this was the last
time he wanted to hear of this matter.

8. Brice was transferred to the Honesdale station
and became my supervisor in or around April 2001,
and his retaliation against me started right away.
He told me that I would never be promoted, and that
he did not forget the past. . . . .

10.   With respect to the issue of my reports
concerning the conduct of Trooper Warner, Marut
initially attempted to coerce me to accept a
voluntary transfer to Honesdale . . . .

11.   I discreetly spoke to Warner's supervisor,
who was my peer equal in rank, about how she
failed to investigate a Credit Card Theft/Identity
Theft that was directly reported to her in person
by a victim on January 29, 2003 who had lost $12,000.
. . . I never officially addressed this matter
directly with Warner, either through counseling or by
issuance of any type of official correspondence, such
as a Correction Notice or Supervisor's Notation.
. . . . . . . . . . . . . . . . . . . . . . . . .

12.   On February 25, 2003, I was involuntarily
transferred from my position as a corporal with
the Gibson station to Honesdale Station. . . . .

13.   After being transferred to Honesdale, I was
delivered a Notice of Discipline for the incident
with Trooper Warner.   The notice stated that I
was to be transferred to Troop T, Turnpike, and
that I was suspended for thirty-five days without
pay.

14, I filed a grievance with the Pennsylvania State Police for the discipline that was imposed upon me.

15.  About ten days before the scheduled hearing in November 2005, the Grievance Board President, who knew very little about my case but was under Marut's command, and the lawyer for the Pennsylvania State Police reached an agreement whereby I was suspended for ten (10) days without pay but that I could continue to work at Honesdale Barracks.  Neither my union attorney nor I was consulted prior to this agreement.

16. My reports and actions that are at issue in this matter were not simply reports I was making as part of my job as a PSP Corporal, but I was motivated by my private interest that the affairs of the PSP be conducted with integrity, ant that the provision of services to the citizens of the Commonwealth of Pennsylvania should be administered with integrity and without being influenced . . . by the personal relationship and other motivations that I have opposed on the part of other members of the PSP that are not in the best interest of proper police protection to the public.

Doc. 98, Exhibits submitted by Plaintiff, Attachment #2 (Exhibit 2).

## V. Discussion.

This is a complicated case from both a legal and factual perspective.  The second motion for summary judgment revisits certain aspects of Skrutski's First Amendment claim and his due process claim.  However, Defendants have failed to address adequately or have overlooked several potential claims. With respect to the First Amendment claim Defendants focus on (1) Skrutski's speech or expression in light of <u>Garcetti</u> with respect to the conduct of Brice, Langan and Warner, (2) Skrutski's First Amendment access to the courts claim, and (3) Struski's procedural due process claim.  The Defendants in their supporting

brief do not address the equal protection claim or the First Amendment claim set forth in the amended complaint relating to alleged retaliation after the original complaint was filed on December 15, 2003. Defendants further do not address the substantive due process claim.

We will first address the First Amendment access to courts claim. Skrutski has based this claim on actions of the Defendants taken after the original complaint was filed involving interference with or intimidation of potential witnesses. However, in order to prevail on an access to courts claim Skrutski must demonstrate actual injury to the pending litigation. Christopher v. Harbury, 536 U.S. 403, 414-16 (2002); see also Konopka v. Borough of Wyoming, 383 F.Supp. 2d 666, 676 (M.D.Pa. 2005)(Caputo, J.). This he has failed to do. The summary judgment record reveals no evidence from which it can be concluded that Skrutski suffered an injury to the pending litigation or injury to potential future litigation as a result of Defendants' conduct.

Although the access to courts claim fails, Skrutski's First Amendment retaliation claim based on actions taken by the Defendants after Skrutski filed the original complaint is viable. Greenwood v. Ross, 778 F.2d 448, 457 (8th Cir. 1985)(filing a civil rights complaint is an activity protected by the First Amendment).[7] In this case there is evidence that after the

_____

7. There is case law that suggests that filing a civil rights complaint which only touches on private issues and not matters of
(continued...)

17

original complaint was filed Brice attempted to place Skrutski in a bad light in the eyes of Trooper Storm, a potential witness. Brice allegedly indicated to Trooper Storm that Skrutski tried to make it appear that she was intoxicated at the time she was involved in the motor vehicle accident in 1994 or 1995.  This alleged attempt by Brice can be viewed as a form of retaliation against Skrutski for filing his complaint.  Also, the amended complaint sets forth allegations which have not been addressed by Defendants in the second motion for summary judgment regarding the action Marut took against William Gross, another employee of the State Police, because of Gross's support of Skrutski. Furthermore, there are allegations in the amended complaint and evidence which we outlined in our opinion of March 29, 2006, and summarized in Part III of this opinion, that Defendant Gilbert included false information in her investigative report of Skrutski.  The alleged conduct of Marut and Gilbert can be viewed as a form of retaliation against Skrutski for filing the original complaint in violation of Skrutski's rights under the First Amendment.

We will now address the matters to which the recent Supreme Court case of <u>Garcetti v. Ceballos</u> relates.

---

7.  (...continued)
public concern is not an activity protected under the First Amendment.  <u>Baker v. Mecklenburg County</u>, 853 F.Supp. 889, 894 (W.D.N.C. 1994).  However, Skrutski's original complaint did raise allegations of criminal misconduct of members of the State Police which would be a concern to the public.

The primary activities in which Skrutski engaged which were the impetus for the alleged retaliatory action by Defendants were the following: (1) Skrutski's reports of Defendant Brice's attempts to falsify investigations, (2) Skrutski's report of Trooper Langan's suspicious activity relating to possible vandalism of another officer's vehicle, (3) Skrutski's criticism and reprimand of Defendant Rebecca S. Warner for allegedly not properly conducting an investigation and (4) the filing of the original complaint in federal court.

Relying on Garcetti Defendants contend that Plaintiff's First Amendment claims are not viable because all of Skrutski's speech was made pursuant to his official duties.  First, it is clear that filing the original complaint was not pursuant to Skrutski's official duties.  Also, Garcetti is distinguishable from the present case and therefore not dispositive of the issue. In Garcetti the speech or expression in question was a memorandum drafted by Richard Ceballos, a deputy district attorney for Los Angeles County.  In the memorandum the deputy district attorney recommended to his supervisor that a criminal case be dismissed. Furthermore, the deputy district attorney did not dispute that he prepared the memorandum pursuant to his duties as a deputy district attorney.  In contrast, in  the present case Skrutski disputes the claim that his speech or expression was made pursuant to his official duties.   From the affidavits submitted by Simons and Skrutski it is clear there are disputed issues of fact regarding the scope of Skrutski's official duties.

Also, in their analysis of <u>Garcetti</u> Defendants have overlooked some critical language.  The Supreme Court stated as follows:

> When a public employee speaks pursuant to employment responsibilities . . . <u>there is no relevant analogue to speech by citizens who are not government employees</u>. . .  Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.  Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail.
>
> Two final points warrant mentioning.  First, as indicated above, the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. <u>We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate.  We reject, however the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.  The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.</u>

<u>Garcetti</u>, 126 S.Ct. at 1961-62 (emphasis added). Defendants have relied on State Police regulations and job descriptions.  This evidence is not dispositive of the issue.

Furthermore, with respect to Skrutski's speech we cannot say that there is "no relevant analogue to speech by citizens who are not government employees."  The speech in question is Skrutski reporting  Brice's attempt to have him falsify a report, Skrutski reporting his observations of Trooper

Langan's conduct, and Skrutski criticizing Warner's handling of a criminal investigation.  With respect to Skrutski reporting Brice's attempt to have him falsify a report, an analogous situation would be Brice attempting to have a private citizen falsify a report or make a false statement.  With regard to Skrutski's report of his observations of Trooper Langan, a private citizen possibly could have observed Langan's conduct and reported it.  Finally, a private citizen could have complained about Warner's handling of the criminal investigation.

Under the circumstances, we will deny the second motion for summary judgment as it relates to the First Amendment claims with the exception of the First Amendment access to the courts claim.  As we noted in our opinion of March 29, 2006, there are numerous disputed facts and credibility issues that cannot be resolved at this stage.

The remaining claims – the substantive and procedural due process claims and the equal protection claim – appear to have support in the summary judgment record.

The Court of Appeals for this Circuit has recognized that "a plaintiff may maintain a claim of substantive due process violation upon allegations that the government deliberately and arbitrarily abused its power."  Midnight Sessions, Ltd., v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir. 1991).  The Court of Appeals further stated:

> [A]llegations that the government's actions in a
> particular case were motivated by bias, bad faith,
> or improper motive, such as partisan political
> reasons or personal reasons . . . may support a

finding of substantive due process violation. . . [A]
government's action may violate substantive due
process if the plaintiff could show a "fundamental
procedural irregularity, racial animus, or the like."

Id. (quoting Creative Environments, Inc. v. Estabrook, 680 F.2d

822, 833 (1st Cir.), cert. denied, 459 U.S. 989 (1982); see also

Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994)("the

substantive component of the Due Process Clause can only be

violated by governmental employees when their conduct amounts to

an abuse of official power that 'shocks the conscience.'").

As for the procedural due process claim, courts have

held that the procedures employed must be adequate to address the

employment dispute. See Alvin v. Suzuki, 227 F.3d 107, 116 (3d

Cir. 2000); see also Keim v. County of Buck, 275 F.Supp.2d 628,

634 (E.D.Pa. 2003)("Although Moving Defendants assert that the

plaintiffs have no cause of action for a violation of their

procedural due process rights in view of the grievance procedures

and arbitration remedy provided under the collective bargaining

agreement, we note that Plaintiffs also aver that the manner in

which the internal investigation into the August 6, 2002,

incident and subsequent disciplinary hearings were conducted was

biased and corrupt. Thus notwithstanding that their employment is

governed by the collective bargaining agreement providing for a

multi-step grievance procedure and arbitration, pursuant to

Alvin, we find that Plaintiffs have alleged sufficient facts to

give rise to a procedural due process claim.").

As for Skrutski's equal protection claim, it may be

based on evidence demonstrating that Skrutski was treated

differently than other state troopers facing disciplinary action and the differential treatment had no rational basis. See Village of Willowbrook v. Olech, 120 S.Ct. 1073 (2000).

With respect to the procedural due process claim Defendants in their brief concede that Skrutski was a union class public employee entitled to procedural due process under a grievance procedure established by contract.  If the discipline imposed on Skrutski was based on an investigation which was tainted by false information and bias or if the Defendants conspired with each other to concoct false information to include in the investigative report prepared by Defendant Gilbert, arguably there could be both procedural and substantive due process claims. Furthermore, the affidavit filed by Skrutski in opposition to the second motion for summary judgment alleges that those bringing the disciplinary charges consulted with the individual presiding over the grievance proceeding and reached an agreement regarding the discipline to be imposed upon him without any input from Skrutski or his attorney. Skrutski's affidavit arguably supports a claim of a denial of procedural due process and equal protection.  We will, therefore, deny the Defendants second motion for summary judgment as it relates to the

procedural and substantive due process claims and the equal

protection claim.

      An appropriate order will be issued.


                    s/Malcolm Muir_____
                    MUIR, U.S. District Judge


Date: September 15, 2006


MM:gs

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS C. SKRUTSKI,              :
                                 :
          Plaintiff              :   No. 3:CV-03-2280
                                 :
          v.                     :   Complaint Filed 12/15/03
                                 :
JOSEPH MARUT, MICHAEL L. BRICE,  :   (Judge Muir)
REBECCA S. WARNER AND WANDA      :
GILBERT,                         :
                                 :
          Defendants             :

ORDER
September 15, 2006


     1.  The second motion for summary judgment as it
relates to the First Amendment access to the courts claim is
granted.

     2.  In all other respects the second motion for summary
judgment is denied.

     3.  The case is placed on the November, 2006, trial
list.


                         s/Malcolm Muir
                         MUIR, U.S. District Judge

MM:gs

25