IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS C. SKRUTSKI,                :
                                   :
          Plaintiff                :   No. 3:CV-03-2280
                                   :
          v.                       :   Complaint Filed 12/15/03
                                   :
JOSEPH MARUT, MICHAEL L. BRICE,    :   (Judge Muir)
REBECCA S. WARNER AND WANDA        :
GILBERT,                           :
                                   :
          Defendants               :

OPINION

MUIR, District Judge

I. Introduction.

On December 15, 2003, Plaintiff Thomas C. Skrutski, a Corporal with the Pennsylvania State Police, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 against four other individuals employed by the Pennsylvania State Police.  On April 15, 2005, Skrutski filed an amended complaint.  Named as defendants in the amended complaint are the following individuals: (1) Joseph Marut, who at the time of the filing of the amended complaint was a Captain with the Pennsylvania State Police;[1] (2) Michael L. Brice, who was the station commander at the Gibson State Police barracks; (3) Rebecca S. Warner, a criminal investigator with the Pennsylvania State Police; and (4) Wanda Gilbert, who was a Lieutenant with the Pennsylvania State Police.[2]

_____

1.  Marut was promoted to Major effective July 30, 2005, and maintains an office at the Wyoming Station as Area II Commander.

2.  Gilbert is no longer employed by the Pennsylvania State Police.

Skrutski claims that the Defendants individually violated his rights under the First and Fourteenth Amendments to the United States Constitution and that they conspired to do so. The First Amendment claims are premised on allegations that the Defendants retaliated against Skrutski for speaking out on matters of public concern.  Skrutski also contends that the Defendants violated his First Amendment right to petition the government (the filing of the original civil complaint in federal court) by engaging in certain acts of retaliation.  Skrutski also raised a First Amendment access to the courts claim. The Fourteenth Amendment claim is based on a contention that Skrutski was denied substantive and procedural due process and equal protection of the law as a result of being subjected to arbitrary and capricious conduct by the Defendants relating to employee discipline and being subjected to a standard different from that which was applied to other Pennsylvania State Police officers.

On July 5, 2005, Defendants filed a motion for summary judgment.  Defendants' motion for summary judgment only addressed part of Skrutski's First Amendment retaliation claim and his conspiracy claim. It did not address Skrutski's due process and equal protection claims and at least two aspects of his First Amendment claim.  The two aspects of the First Amendment claim not addressed in the motion for summary judgment were Skrutski's contention that (1) he was retaliated against when Defendants allegedly intimidated or interfered with witnesses and (2) he was denied access to the courts. This case was reassigned to us on

2

March 20, 2006.  On March 29, 2006, we issued an order denying the motion and the case was placed on the July, 2006, trial list,

On June 14, 2006, Defendants filed a motion in limine relating, inter alia, to "any testimony of 'wrongdoing' involving the official job responsibilities, i.e., Skrutski's allegations of unfavorable scheduling, unfair investigation, and unfair evaluations."  The motion in limine primarily relied on the then recent United States Supreme Court case of Garcetti v. Ceballos, ____U.S.___, 126 S.Ct. 1951 (May 30, 2006).  In that case the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id., at 1960.

A First Amendment retaliation claim requires a plaintiff to prove the following three elements: (1) that the plaintiff engaged in protected First Amendment activity; (2) the government responded with retaliation; and (3) the protected activity was the cause of the government's retaliation.  Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997).  For purposes of the summary judgment motion, Defendants conceded that Skrutski engaged in activity protected by the First Amendment.  The motion in limine related to evidence which allegedly would establish that Skrutski engaged in First Amendment protected activity, i.e,, the first element of a First Amendment retaliation claim which Skrutski was required to prove.  By order of June 16, 2006,

we converted the motion in limine to a second motion for summary
judgment and required supplemental briefing.  The trial scheduled
for July, 2006, was continued sine die.

     The second motion for summary judgment revisited
certain aspects of Skrutski's First Amendment claim and his due
process claim.  However, Defendants failed to address adequately
or overlooked several potential claims.  With respect to the
First Amendment claim Defendants focused on (1) Skrutski's speech
or expression in light of <u>Garcetti</u> with respect to the conduct of
Brice, Langan[3] and Warner, (2) Skrutski's First Amendment access
to the courts claim, and (3) Skrutski's procedural due process
claim.  The Defendants in their supporting brief did not address
the equal protection claim or the First Amendment claim set forth
in the amended complaint relating to alleged retaliation after
the original complaint was filed on December 15, 2003.
Defendants further did not address the substantive due process
claim.

     In their analysis of <u>Garcetti</u> Defendants overlooked
some critical language.  The Supreme Court stated as follows:

> Two final points warrant mentioning.  First,
> as indicated above, the parties in this case do not
> dispute that Ceballos wrote his disposition memo
> pursuant to his employment duties.  <u>We thus have no
> occasion to articulate a comprehensive framework
> for defining the scope of an employee's duties in
> cases where there is room for serious debate.  We
> reject, however the suggestion that employers can</u>

---

3. Langan was a Corporal with the Pennsylvania State Police who
was stationed at the Gibson State Police barracks.  He is not a
defendant in this action.

> restrict employees' rights by creating excessively
> broad job descriptions.  The proper inquiry is a
> practical one.  Formal job descriptions often bear
> little resemblance to the duties an employee
> actually is expected to perform, and the listing of
> a given task in an employee's written job description
> is neither necessary nor sufficient to demonstrate that
> conducting the task is within the scope of the
> employee's professional duties for First Amendment
> purposes.

Garcetti, 126 S.Ct. at 1961-62 (emphasis added).  Relying on

Garcetti and State Police regulations and job descriptions,

Defendants contended that Skrutski's First Amendment claims were

not viable because all of Skrutski's speech was made pursuant to

his official duties. This argument was not dispositive of the

issue.

        First, it was clear that the filing of the original

complaint was not pursuant to Skrutski's official duties.  Also,

in Garcetti the speech or expression in question was a memorandum

drafted by Richard Ceballos, a deputy district attorney for Los

Angeles County.  In the memorandum the deputy district attorney

recommended to his supervisor that a criminal case be dismissed.

Furthermore, the deputy district attorney did not dispute that he

prepared the memorandum pursuant to his duties as a deputy

district attorney.  In contrast, in the present case Skrutski

disputed the claim that his speech or expression was made

pursuant to his official duties.  From affidavits submitted by

the Defendants and Skrutski it was clear there were disputed

issues of fact regarding the scope of Skrutski's official duties.

        The second motion for summary judgment became ripe for

disposition on September 5, 2006.  On September 15, 2006, we

5

issued an order granting summary judgment to Defendants on Plaintiff's First Amendment access to the courts claim and denied the motion in all other respects.

The case was placed on the November, 2006, trial list and a jury was selected on November 2, 2006. The evidentiary phase of the trial commenced on November 6, 2006, and concluded on November 20, 2006, The jury was charged, closing arguments given and the jury commenced deliberations on November 21, 2006.

The matter was submitted to the jury by way of 36 special verdict questions. The jury was instructed to answer the special verdict questions based upon a preponderance of the evidence.  Rule 49(a) of the Federal Rules of Civil Procedure states in toto as follows:

> (a) Special Verdicts.  The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate.  **The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue.  If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury.**  As to an issue omitted without such a demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

(Emphasis added.)  No objections were raised to the substance or form of the special verdict questions submitted to the jury and neither the Plaintiff nor Defendants requested that the court submit additional questions to the jury.

The jury was charged in detail as to what constitutes a conspiracy and with respect to the 1st and 14th Amendment claims as follows:

> We will now more specifically outline the elements of Plaintiff's 1st Amendment claim.  In order to establish such a claim Plaintiff must prove the following elements:
>
> > (1) he engaged in protected First Amendment activity;
> >
> > (2) the defendants individually or jointly responded with retaliation; and
> >
> > (3) the First Amendment protected activity was the cause of or motivation for the retaliation.
>
> Plaintiff alleges that the First Amendment protected activity that he engaged in was the following:
>
> > (1) his reports of Defendant Brice's attempts to falsify investigations;
> >
> > (2) his reports of Trooper Langan's suspicious activity relating to possible vandalism of another officer's vehicle;
> >
> > (3) his criticism and reprimand of Defendant Rebecca S. Warner for allegedly not properly conducting an investigation; and
> >
> > (4)  his filing of the original complaint on December 15, 2003, in this court.
>
> The actions of the governmental body or official need not be unlawful for you to conclude that they were retaliatory.  An otherwise legitimate and constitutional act can become unconstitutional when a Plaintiff demonstrates that it was undertaken in retaliation for his or her exercise of First Amendment speech.  The motives of governmental officials are

indeed relevant when an individual's exercise of speech precedes government action affecting the individual.

**When a public employee, such as Plaintiff, makes statements pursuant to his official duties, the employee is not speaking as a citizen for First Amendment purposes, and the Constitution does not insulate his communications from employer discipline. If Plaintiff's statements relating to (1) Brice's alleged attempts to falsify investigations, (2) Trooper Langan's alleged suspicious activity and (3) Defendant Warner's allegedly improper investigation were made as part of Plaintiff's official duties, those reports or statements are not protected First Amendment activity. However, an employer can not restrict an employee's rights by creating excessively broad job descriptions. The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.**

**So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.**

Plaintiff is not required to prove that his protected activity was the sole motivation or even the primary motivation for a defendant's decision or conduct.  Plaintiff need only prove that his protected activity played a motivating part in defendant's decision or conduct even though other factors may also have motivated a defendant.

**There is no violation of a plaintiff's 1st Amendment rights by a defendant, if that defendant would have reached the same decision to take action against the plaintiff even in the absence of the plaintiff's 1st Amendment activity.**

We will now address Plaintiff's due process and equal protections claims.

The due process claim has two parts.  First, Plaintiff claims that Defendants individually violated his substantive due process rights and that they conspired to do so.   In order to establish that a Defendant violated Plaintiff's right to substantive due

8

process, Plaintiff must establish that the government official deliberately and arbitrarily abused his or her power.  Evidence that the government official's actions were motivated by bias, bad faith, or improper motive such as partisan political reasons or personal reasons may support a finding of a substantive due process violation.  A government official's actions may violate substantive due process if the plaintiff can show a fundamental procedural irregularity.  However, in order to conclude that there has been such a violation the conduct that the governmental official engaged in must shock the conscience.

In determining whether substantive due process rights have been violated we look to such factors as the need for the governmental action in question, the relationship between the need and the action, the extent of the harm inflicted, and whether the action was taken in good faith or for the purpose of causing harm.  Malicious, irrational, and plainly arbitrary actions are not within the legitimate purview of the official's power.

In summary, to establish a violation of the Substantive Due Process Clause, Plaintiff must show that

(1) Defendants' actions constituted an arbitrary use of official power;

(2) Defendants' conduct was motivated by personal interest or ill-will;

(3) Defendants' actions served no legitimate governmental purpose; and

(4) Defendants' actions were outrageous and shocking to the conscience.

Evidence of an improper motive on the part of the Defendants is not enough to conclude that Plaintiff's substantive due process rights were violated.  For you to conclude that Defendants violated the due process rights of Plaintiff, the Defendants' conduct must be outrageous and must shock the conscience.

Second, Plaintiff claims that Defendants individually violated his procedural due process rights and that they conspired to do so.  Generally, where a procedural due process claim is raised against a public official or employer, and grievance and arbitration procedures are in place, those procedures satisfy the procedural due process requirements of the 14th

Amendment.  However, the procedures employed must be adequate to address the employment dispute and the existence of grievance and arbitration procedures is not dispositive of the issue.  A Plaintiff may establish a procedural due process violation if the grievance and arbitration procedures were tainted by a biased and corrupt internal investigation into the alleged employee misconduct or a biased and corrupt disciplinary hearing.

The final claim you must address is Plaintiff's equal protection claim.  Plaintiff claims that the Defendants violated his equal protection rights by treating him differently than similarly situated state troopers.  To establish a violation of the Equal Protection Clause, Plaintiff must show that

(1) that he was intentionally treated differently than other similarly situated state troopers; and

(2) that there was no rational basis for the difference in treatment.

Doc. 124, Charge to the Jury, pages 15-20 (Emphasis added)(a copy of the charge was provided to each juror).

On November 27, 2006, the jury returned with answers to the special verdict questions.  Those special verdict questions along with the answers are as follows:

1.   Did Plaintiff engage in First Amendment protected activity when he reported Defendant Brice's alleged attempts to falsify investigations?

Answer: Yes

2.   Did Plaintiff engage in First Amendment protected activity when he reported his alleged observations of Trooper Langan relating to the possible vandalism of another Trooper's vehicle?

Answer: Yes

3.   Did Plaintiff engage in First Amendment protected activity when he criticized and reprimanded Defendant Rebecca S. Warner for allegedly not properly conducting an investigation?

Answer: Yes

4.   Did Joseph Marut retaliate against Plaintiff or conspire with Michael L. Brice, Rebecca S. Warner or Wanda Gilbert to retaliate against Plaintiff because Plaintiff engaged in First Amendment protected activity?

Answer: Yes

5.   Did Michael L. Brice retaliate against Plaintiff or conspire with Joseph Marut, Rebecca S. Warner or Wanda Gilbert to retaliate against Plaintiff because Plaintiff engaged in First Amendment protected activity?

Answer: Yes

6.   Did Rebecca S. Warner retaliate against Plaintiff or conspire with Joseph Marut, Michael L. Brice  or Wanda Gilbert to retaliate against Plaintiff because Plaintiff engaged in First Amendment protected activity?

Answer: Yes

7.   Did Wanda Gilbert retaliate against Plaintiff or conspire with Joseph Marut, Michael L. Brice  or Rebecca S. Warner to retaliate against Plaintiff because Plaintiff engaged in First Amendment protected activity?

Answer: Yes

8.   Did Defendant Marut retaliate against Plaintiff or conspire to do so because Plaintiff filed a civil complaint in this court on December 15, 2003?

Answer: Yes

9. Did Defendant Brice retaliate against Plaintiff or conspire to do so because Plaintiff filed a civil complaint in this court on December 15, 2003?

Answer: Yes

10.  Did Plaintiff suffer actual injury or damage as a direct result of the violation of his First Amendment rights?

Answer: Yes

11.  State the amount of money which will compensate

11

Plaintiff for the actual injury or damage he suffered
as a result of the violation of his First Amendment
rights.

Answer: $100,000.00

The jury in accordance with the special verdict question

instructions skipped question 12 and next answered question 13.

13.  Did Joseph Marut violate Plaintiff's substantive
due process rights or conspire with Michael Brice,
Rebecca S. Warner or Wanda Gilbert to do so?

Answer: Yes

14.  Did Michael L. Brice violate Plaintiff's
substantive due process rights or conspire with Joseph
Marut, Rebecca S. Warner or Wanda Gilbert to do so?

Answer: Yes

15.  Did Rebecca S. Warner violate Plaintiff's
substantive due process rights or conspire with Joseph
Marut, Michael L. Brice or Wanda Gilbert to do so?

Answer: Yes

16.  Did Wanda Gilbert violate Plaintiff's substantive
due process rights or conspire with Joseph Marut,
Michael L. Brice or Rebecca S. Warner to do so?

Answer: Yes

17.  Did Plaintiff suffer actual injury or damage as a
direct result of the violation of his right to
substantive due process of the law?

Answer: Yes

18.  State the amount of money which will compensate
Plaintiff for the actual injury or damage he suffered
as a direct result of the violation of his substantive
due process rights.

Answer: $50,000.00

The jury in accordance with the special verdict question

instructions skipped question 19 and next answered question 20.

20. Did Joseph Marut violate Plaintiff's procedural due process rights or conspire with Michael L. Brice, Rebecca S. Warner or Wanda Gilbert to do so?

Answer: Yes

21.  Did Michael L. Brice violate Plaintiff's procedural due process rights or conspire with Joseph Marut, Rebecca S. Warner or Wanda Gilbert to do so?

Answer: Yes

22.  Did Rebecca S. Warner violate Plaintiff's procedural due process rights or conspire with Joseph Marut, Michael L. Brice or Wanda Gilbert to do so?

Answer: No

23.  Did Wanda Gilbert violate Plaintiff's procedural due process rights or conspire with Joseph Marut, Michael L. Brice or Rebecca S. Warner to do so?

Answer: Yes

24.  Did Plaintiff suffer actual injury or damage as a direct result of the violation of his right to procedural due process of the law?

Answer: Yes

25.  State the amount of money which will compensate Plaintiff for the actual injury or damage he suffered as a direct result of the violation of his procedural due process rights.

Answer: $50,000.00

The jury in accordance with the special verdict question instructions skipped question 26 and next answered question 27.

27.  Did Joseph Marut violate Plaintiff's equal protection rights or conspire with Michael L. Brice, Rebecca S. Warner or Wanda Gilbert to do so?

Answer: Yes

28.  Did Michael L. Brice violate Plaintiff's equal protection rights or conspire with Joseph Marut, Rebecca S. Warner or Wanda Gilbert to do so?

Answer: Yes

13

29.  Did Rebecca S. Warner violate Plaintiff's equal protection rights or conspire with Joseph Marut, Michael L. Brice or Wanda Gilbert to do so?

Answer: Yes

30. Did Wanda Gilbert violate Plaintiff's equal protection rights or conspire with Joseph Marut, Michael L. Brice or Rebecca S. Warner to do so?

Answer: Yes

31.  Did Plaintiff suffer actual injury or damage as a direct result of the violation of his right to equal protection of the law?

Answer: Yes

32.  State the amount of money which will compensate Plaintiff for the actual injury or damage he suffered as a direct result of the violation of his equal protection rights.

Answer: $10,000.00

The jury in accordance with the special verdict question instructions skipped question 33 and next answered question 34.

34.  Did any of the Defendants act maliciously or wantonly towards Plaintiff?

Answer: Yes

35.  Please identify which defendants acted maliciously or wantonly towards Plaintiff by placing a check before the defendant's name.

Answer: Joseph Marut, Michael L. Brice, Rebecca S. Warner and Wanda Gilbert

36.  What amount of money do you award Plaintiff to punish the defendant or defendants identified in question 35 (you may award an amount of money only for those defendants you identified in question 35)?

Answer:   Joseph Marut        $50,000.00
          Michael L. Brice    $50,000.00
          Rebecca S. Warner   $ 5,000.00
          Wanda Gilbert       $25,000.00

14

Doc. 128, Special Verdict Questions filed November 27, 2006.

On November 28, 2006, we directed the Clerk of Court to enter judgment in favor of the Plaintiff in the total amount of $340,000.00 plus costs permitted to be recovered under 28 U.S.C. § 1920.  On December 11, 2006, Defendants filed a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, or alternatively, for a new trial or for a remittitur under Rule 59(a).  A supporting and an opposition brief have been filed and the motion became ripe for disposition on May 11, 2007, with the filing of Defendants' reply brief.

II.   Standard for Reviewing a Motion
      for Judgment as a Matter of Law.

A party is entitled to a judgment as a matter of law if after Plaintiff was heard fully "there is no legally sufficient basis for a reasonable jury to find for" Plaintiff. Fed.R.Civ.P. 50(a).  In deciding such a motion we are required to view the evidence in the light most favorable to the verdict winner and give that party the advantage of every fair and reasonable inference. McDaniels v. Flick, 59 F.3d 446, 454 (3d Cir. 1995); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  We are prohibited from weighing the evidence, judging the credibility of witnesses or substituting our version of the facts for the jury's version.  Id.  In answering the special verdict questions in this case, the jury as the fact-finder had the right to reject in toto the testimony and evidence presented by the Defendants. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000).

III.   Standard for Reviewing a Motion for a New Trial.

The decision whether to grant or deny a motion for a new trial rests in the sound discretion of the court.  Blancha v. Raymark Industries, 972 F.2d 507, 512 (3d Cir. 1992).  Federal Rule of Civil Procedure 59(a) permits the court to order a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Although the Rule does not attempt to specify the grounds on which a new trial can be granted, Federal Rule of Civil Procedure 61 states that the court should not order a new trial unless "substantial justice" so requires.  The court is instructed to disregard any "error or defect in the proceeding which does not affect the substantial rights of the parties." Id.

District courts have recognized that a prejudicial error of law or a verdict against the weight of the evidence may be a ground for a new trial.  See Maylie v. National Railroad Passenger Corp., 791 F. Supp. 477, 480-81 (E.D. Pa. 1992) aff'd, 983 F.2d 1051 (3d Cir. 1992).  When a party claims that the verdict is against the weight of the evidence, "a court should be reluctant to grant a new trial unless it is apparent that the jury reached a seriously erroneous result." Id.  Furthermore, Federal Rule of Evidence 103(a) provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected [and an objection or offer of proof was made]."

16

With regard to evidentiary rulings, the decision to grant or deny a new trial depends on whether the outcome of the proceedings may have been altered by the exclusion or admission of the evidence.  Specifically, the Court of Appeals for this circuit has held that the test for harmless error is whether it is highly probable that the error did not affect a party's substantial rights.  McQueeny v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985).  In explaining how to apply this standard the Court of Appeals for this circuit referred to the standard applied in criminal cases which permits affirmance even in light of an evidentiary error if it is highly probable that the error did not affect the judgment.  Id. at 924-25.

IV.   Evidence Presented at Trial.

In our decisions of March 29 and September 15, 2006, we stated that our review of the summary judgment record revealed numerous disputed facts.  We then after viewing the record in a light most favorable to Skrutski set forth the facts that a jury could find.  The facts that were outlined in our two decisions relating to the summary judgment motions were supported by the evidence submitted by Plaintiff at the trial in November of 2006. We will now outline the most pertinent evidence received at trial in a light most favorable to Plaintiff as we are required to do when addressing a motion for judgment notwithstanding the verdict and a motion for a new trial.

Skrutski was stationed at the Gibson barracks from April 24, 1993, until he was involuntarily transferred to the

17

Honesdale barracks on February 25, 2003.  Defendant Joseph Marut
was a captain in the Pennsylvania State Police and was the troop
commander of the barracks where Skrutski was stationed.
Defendant Michael Brice was the station commander at Gibson
beginning in April of 2001.  Defendant Rebecca S. Warner was a
criminal investigator assigned to Troop R, Gibson station.
Defendant Wanda Gilbert was the criminal investigations section
commander at the Dunmore barracks until she retired in June 2004.

In approximately 1993, Skrutski became aware of an
accident involving Trooper Judith R. Holly-Storms.  During the
investigation of that accident, Brice, then a Corporal, requested
that Skrutski falsify the investigation to make it appear that
Holly-Storms was intoxicated.  Initially Brice requested during a
telephone conversation that Skrutski file a supplemental report
indicating that Skrutski found beer bottles in the vehicle and
that there was no deer hair on the vehicle.  Skrutski refused and
hung up the phone.  Brice subsequently went to the Gibson station
where Skrutski worked and had a further conversation with
Skrutski.  During that conversation Brice asked Skrutski to talk
to the individuals who were working the night of the accident and
have them "say that [Holly-Storms] was drunk."  Skrutski again
refused and told him to leave the barracks. Skrutski then
informed his station commander, Sergeant Joseph Fawcett, of
Brice's actions.  Fawcett called and relayed the information to
his superior. Fawcett then told Skrutski not to worry about the
matter and that the incident would be addressed.

Approximately eight months later, Brice again contacted Skrutski and requested that he falsify an investigation, this time involving Trooper Sanfillipo.  Skrutski again reported Brice's actions to Fawcett, and Fawcett called his supervisor and then told Skrutski that the incident would be addressed. Thereafter, Brice was transferred to a position normally held by a trooper but remained at the rank of a corporal.

Shortly before Brice assumed command of the Gibson barracks in April 2001, Skrutski observed Corporal Langan kneeling beside Trooper William Gross's personal vehicle.  Langan held a lug wrench and had a four-way wrench and a tire wrench. Skrutski heard a metal 'clang' and wondered what Langan was doing.  He did not inquire further because Langan was the vehicle maintenance officer and could have been fixing the vehicle as a favor.  A few days later, Trooper Gross informed Skrutski that someone had flattened his tires several times and on one occasion had loosened his lug nuts.  Skrutski brought this matter to the attention of Sergeant Thomas Pavlick who was the station commander at the time.  He explained what he had witnessed and related Gross's complaint.  Pavlick took no action, and explained that he would be the station commander for the next three days only, and Skrutski should discuss the matter with Brice when he assumed command.

When Skrutski informed Brice of this matter a few days after Brice took command, Brice became irate.  Brice stated that he could not believe that Langan would do such a thing, that

Langan was a personal friend of his, and that he considered the matter closed. Skrutski raised the matter with Brice several more times, including during a meeting in May 2001 when Brice again became angry and screamed at Skrutski. Brice told Skrutski that his "career is over" and he would use his influence to ensure that he would never again be promoted.

In the fall of 2002, Brice called Skrutski into his office to discuss the matter again. Brice called Pavlick and asked if he could recall the incident and Pavlick said he could not. Brice then informed Skrutski that he would take no further action regarding the incident. Later, when Defendant Gilbert conducted an investigation in 2003 into Skrutski's behavior, Skrutski informed her of the incident and she took no action although Gross acknowledged the incident. Gross testified that he told both Sergeant Pavlick and Brice about the incident. Gross also testified that he was asked about the incident by Gilbert but was never formally interviewed. One of the disciplinary charges leveled against Corporal Skrutski was that he falsely accused Corporal Langan of a criminal act.

After Brice assumed command of the Gibson barracks in April 2001, Skrutski was scheduled to patrol; thus he was required to perform the duties of a trooper in addition to performing his supervisory duties as a corporal. From April to December 2001, he was assigned 100 shifts as a trooper. The three other corporals combined were not assigned that many trooper shifts.

Brice scheduled Skrutski to work premium holidays, where pay is double, less frequently than Skrutski had been so scheduled prior to Brice's arrival.  Skrutski requested that he receive two P.M. shifts per week so he could attend to family matters relating to a disabled child during the day.  He did not receive the two P.M. shifts for approximately half of the weeks requested even though he constantly asked Brice for those shifts.

Brice gave Skrutski an evaluation in the summer of 2001 which had the lowest score Skrutski ever received. The manner in which the evaluation was given to Skrutski did not follow past practice.  In the past evaluations had been placed in Skrutski's in-box.  Brice did not follow that practice.  Instead, he called Skrutski into his office and read him the evaluation.  After reading the evaluation, Brice "smiled . . . and said I'll bet this is the lowest evaluation you ever got . . . Then he said . . . did you think I was just going to forget about what happened in the past."  Doc. 147, Trial Transcript, p. 82.

Up until Brice assumed command at the Gibson barracks, Skrutski always had excellent or outstanding performance evaluations. Brice also chastised him when he followed regulations and properly secured a weapon which was left unattended in the station by Corporal Langan. Defendant Marut threatened to commence an internal investigation claiming that Skrutski stole the firearm.  Although he was not specifically disciplined as a result of this incident, Brice  consistently gave him unfavorable shifts thereafter.

In May 2001, Brice held a counseling session with Skrutski wherein he informed him that he would no longer be permitted to change, modify, or edit the schedule. Brice made this decision because Skrutski had changed two troopers' work assignments on a shift that he supervised.  Skrutski had placed an officer on desk duty because he was injured and was unable to be on the road.

In October 2001, a clerk informed Skrutski that there was a problem with the schedule for the day.  Skrutski explained that he was not permitted to modify the schedule, but the clerk insisted that a decision be made. Skrutski attempted to locate Brice, who was listed on the schedule for a "special assignment," as was Trooper Warner.  Skrutski called Brice's home, and Brice's daughter informed him that Brice was golfing with Captain Marut. Later, Brice called Skrutski and accused him of improperly investigating him.  Skrutski explained that he merely needed his advice on a scheduling matter, and Brice then directed him on the scheduling matter.  Several days later, Brice sent Skrutski an email to schedule a counseling session with Captain Marut to discuss whether Brice's golf outing was approved.  The meeting, however, never took place. The "special assignment" was a golfing outing attended by Captain Marut, Trooper Warner and Corporal Brice.

At some unspecified time after Brice took command, Skrutski questioned the method by which Brice apportioned overtime.  Skrutski informed Brice that granting overtime on the

22

basis of personal friendships violated Captain Marut's policy of granting overtime to the most productive officers.  Brice insisted that all troopers be granted overtime not just the most productive.

In February of 2002, Skrutski made a written request to be transferred to the Dunmore barracks. The written request was given to Brice.  Brice told Skrutski that he would deliver it personally to Marut.  A short time later Skrutski received a call from Brice stating that Marut wanted to talk to him.  Testimony by Skrutski at trial relating to this phone conversation was as follows:

> Captain Marut got on the phone and asked me so you want to go to Dunmore, huh.  I said yes, sir, I would like to get closer to home, get out of this situation up here.
>
> He paused a second and said well, I'm not sending you.  I'm going to send a more junior corporal from the Honesdale station.  You're going to stay up at Gibson a little while longer.  I could hear Sergeant Brice in the back.  It sounded like he was laughing.  And he said something like is that it then.  I said yes, sir.  And he hung up the phone.

Doc. 147, Trial Transcript, p. 86.

On January 29, 2003, Skrutski assigned a complaint to the criminal investigations unit and Defendant Warner felt it was unnecessary for her unit to handle it because the unit was busy and patrol members were available to do the work.  Warner then approached Skrutski and, using profanity and raising her voice, told Skrutski that she would not take the assignment from him and only Gilbert could assign work to her.  Skrutski asked her to please interview the complainant and she left his office to

23

conduct the interview.  Warner submitted her report and Skrutski
believed that she should have conducted a more thorough
investigation.

On February 25, 2003, Skrutski was instructed to report
to Captain Marut's office, and he complied.  Marut informed him
that he was being transferred to Honesdale immediately when he
walked into the office.  Marut explained that he did not have a
lot of details but he knew Warner intended to file a complaint
and Skrutski would be transferred pending the complaint.  Marut
then stated he was a very good friend of Warner and offered to
end the matter if Skrutski would take a voluntary transfer to
Honesdale.  Skrutski said he would agree to a voluntary transfer
to Dunmore but not Honesdale.  Dunmore was more convenient for
Skrutski than either Honesdale or Gibson.

Skrutski's responsibilities at Honesdale were identical
to those at Gibson.  His pay was not reduced although he may have
received more overtime pay had he stayed at Gibson because of
construction projections at Gibson that year.  Honesdale is
twenty to twenty three miles from his home, and Gibson is
approximately thirty.  Additionally, Skrutski was placed on
restricted duty status.

Marut and Warner were very close and intimate friends.
At a social function involving a number of Pennsylvania State
Police personnel, Marut and Warner were observed dancing.
Trooper Warner was also observed sitting on Captain Marut's lap.
Trooper Mark Prushinski overheard Trooper Warner and Captain

Marut engage in intimate conversation.  Specifically, Trooper
Prushinski testified that after a golf outing held at the
Panorama Golf Course he overheard a conversation between Marut
and Warner relating to the "the benefits of a big cock."

     Warner and Marut attended a golfing outing in the
State of New York.  Warner drove her personal vehicle and Marut
was a passenger.  Warner and Marut attended Pennsylvania State
Police golf tournaments.  At these tournaments, Marut would greet
Warner with a hug and a kiss on the cheek and sometimes on the
lips.

     Defendant Gilbert was a Lieutenant under Marut's
command. Warner was one of Lieutenant Gilbert's criminal
investigators.  Gilbert has visited Warner's home and has stayed
overnight at her home on at least one occasion. Gilbert had what
can be generally described as a personal friendship with Warner.

     When Warner made the complaint against Skrutski, Marut
assigned Gilbert as the investigator.  Warner never formally
filed a written complaint outlining her claims of harassment by
Skrutski.  As part of the investigation, Gilbert called Skrutski
on numerous occasions, she interviewed him at Honesdale once, and
then she held a formal interview sometime in the spring of 2003.

     Although the investigation was centered on the charge
that Skrutski harassed Warner, it was broadened to uncover
incidents within the last 15 years of Skrutski's career relating
to troopers in general.  During the investigation, Gilbert
interviewed 30 individuals.  Of the 30 individuals interviewed by

Gilbert only three allegedly stated they were stressfully affected by working around Skrutski. One of those individuals was Trooper Mark Mulvey.  Gilbert reported that Skrutski's behavior caused Mulvey to have stress induced nose-bleeds. Mulvey testified that he never made a statement to that effect.

No evidence was developed during Gilbert's investigation that Skrutski engaged in quid pro quo sexual harassment or treated Warner differently because of her gender.

On June 23, 2003, Marut issued a disciplinary action report summarizing the results of the investigation and warning that the report could result in discipline, including transfer. After receiving the report, Skrutski consulted with his union and pursuant to its instruction filed a grievance.

In the fall of 2003, Lieutenant Gryzboski handed Skrutski a document setting forth the punishment to be imposed on him.  None of the defendants had the authority to issue the final punishment, which was administered by Department of Discipline Officers Lt. Karl Harrison and Captain Robert Titler.  Skrutski had been a member of the Special Emergency Response Team since February 1992.  Skrutski received thirty-five days without pay and was assigned to Troop T turnpike which is the only troop in the Pennsylvania State Police without a Special Emergency Response Team program.  Skrutski no longer had access to a state car.

After Skrutski filed the instant complaint, Brice informed Trooper Holly-Storms that the investigation into Holly-

Storms' accident which occurred in 1993 was somehow related to Skrutski's lawsuit.  Brice told Storms that Skrutski had alleged that Brice attempted to cover-up her drinking.  As noted above, Skrutski had reported that Brice had requested Skrutski that he falsify the investigation to make it appear as though Holly-Storms were intoxicated.

There is evidence in the trial record indicating that Skrutski lost the opportunity to receive overtime.  Skrutski received approximately $1600.00 in overtime in 2001.  During the year following the arrival of Brice Skrutski only received approximately $100.00 in overtime.  There is also evidence that Brice gave Skrutski a dangerous assignment relating to a mentally unstable individual and refused Skrutski's request that the Special Emergency Response Team be activated to deal with the situation.

The trial record reveals that Brice and Marut knew each other and were close personal friends for at least 25 years. That record further reveals that Marut was stationed at Troop P Wyoming when Brice was stationed at that barracks in the late 90s.  The trial record reveals a long association between Brice, Marut and Warner.   With respect to the Gibson station, the record also reveals a clique involving Marut, Brice, Warner, Gilbert and the troopers assigned as criminal investigators. This clique socialized at golf outings and other events.

The trial record reveals many conflicts between the testimony of the Defendants and the testimony of Skrutski and

those who testified on his behalf.  Because of the conflicts the
jury could have decided to disbelieve totally the testimony
presented by the Defendants.  For example, with respect to the
incidents involving Troopers Holly-Storms and Sanfillipo,
Defendant Brice flatly denied that he communicated in 1993 and
1994 with Skrutski regarding those two troopers.  He stated: "I
never contacted that man concerning that accident." Doc. 144,
Trial Transcript, Vol. II, p. 126.  At another point he stated:
"I never talked to that man."  Doc. 144, Trial Transcript, Vol.
II,  pag 127.  However, two witnesses - Joseph Fawcett and Mary
Joan Raggard – presented testimony supporting Skrutski's claim
that Brice in fact contacted him regarding the two incidents.[4]

V.  Discussion.

Earlier in this opinion we set forth a portion of the
charge on the law which was given to the jury and which outlined
the law with respect to Plaintiff's 1st and 14th Amendment claims.
Defendants had no objection to our charge other than with respect
to one matter which we will address shortly in the next
paragraph.  The trial testimony was very similar to the evidence
outlined in our two prior decisions and viewing that evidence in
a light most favorable to Skrutski and giving him the advantage

---

4.  The testimony of Ms. Raggard revealed that she knew Brice and
that when she was working as a Communications Officer at the
Gibson station Brice called and asked to speak to Skrutski. She
turned the phone call over to Skrutski and observed Skrutski
speaking to Brice on the phone.  Sergeant Joseph Fawcett
testified that in the 1993-1994 time frame Skrutski contacted him
about an incident where Brice was interfering with an
investigation.

28

of every fair and reasonable inference, we see no reason to grant Defendants' motion for judgment as a matter of law.

We will now address Defendants' claim for a new trial. Defendants contend that the jury was not properly instructed on Defendants' affirmative defense of nonretaliatory motive for the actions taken against Skrutski.  Defendants, however, did not request that any special verdict questions relating to this affirmative defense be submitted to the jury. Consequently, there was no need to instruct the jury on the affirmative defense because under Rule 49 as noted previously the court is only required to give the jury "such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue."

Furthermore, to the extent that such an instruction was necessary the court adequately covered the affirmative defense when it gave the following instruction:

> There is no violation of a plaintiff's First Amendment rights by a defendant, if that defendant would have reached the same decision to take action against the Plaintiff even in the absence of the plaintiff's First Amendment activity.

Doc. 124, Charge to the Jury, p. 17.

The Defendants also claim a new trial should be granted because certain evidence was presented that was not revealed during discovery and certain witnesses were unfairly impeached. We discern no unfair surprise as a result of permitting certain testimony that allegedly was not revealed during discovery or any unfair questioning of witnesses by Plaintiff's counsel.

29

The evidentiary phase of the trial lasted from November 6 through November 26.  Defense counsel certainly had an opportunity during that period to develop a response to the allegedly new information.  Furthermore, defense counsel did not ask for a continuance in order to develop evidence.  Also, as a result of our allowing Plaintiff to present certain evidence we authorized defense counsel to use information that was not previously turned over to Plaintiff during discovery.

As for the other alleged evidentiary errors relating to the impeachment of witnesses, those rulings do not justify the granting of a new trial.  If there were any errors – and defense counsel only refers to four instances in her brief –  relating to the allowance of certain testimony, we are satisfied that they were harmless errors. See McQueeny v. Wilmington Trust Co., supra, [5]

The final matter that we must address is Defendants' request for a remittitur or reduction in the amount of the judgment entered in this case.  Remittitur is appropriate if the Court "finds that a decision of the jury is clearly unsupported

_____

5.  Defense counsel refers to the cross-examination of Trooper Biondo and Corporal Ford relating to whether they were ever docked hours for showing up intoxicated. Defense counsel also refers to the cross-examination of Sergeant O'Day regarding whether he utilized a State Police vehicle while under the influence of alcohol. The fourth claim of error relates to the examination of Defendant Warner relating to a motor vehicle accident and whether she reported the accident.  Plaintiff's questions did have some relevance to his equal protection claim. We further note that when Plaintiff did not follow-up with additional evidence, defense counsel did not move to strike the testimony or for a cautionary instruction.

and/or excessive." Spence v. Board of Educ. Of Christina Sch. Dist., 806 F.2d 1198, 1201 (3d Cir. 1986).  If remittitur is granted, the party against whom it is entered can accept it or can proceed to a new trial on the issue of damages.

In this case it is clear that Skrutski's economic injury was relatively minor.  However, compensatory damages include, in addition to pecuniary or financial losses, the harm to the Plaintiff's reputation which resulted from the Defendants' conduct and the emotional stress, mental anguish, and humiliation which the Plaintiff suffered as a result of the Defendants' conduct.  See Doc. 124, Charge to the Jury, p. 21.

In this case the jury awarded compensatory damages totaling $210,000.00.  Any non-monetary injury suffered by Skrutski commenced on February 25, 2003, and arguably continued through November of 2006.  The jury also awarded punitive damages totaling $130,000.00.  The jury concluded that each defendant violated Skrutski's constitutional rights or conspired to do so and that each defendant acted maliciously or wantonly towards Skrutski.

Under the circumstances presented we cannot conclude that the jury's award of $210,000.00 for compensatory damages is "clearly unsupported and/or excessive."  Likewise, we cannot

conclude that the jury's award of $130,000.00 for punitive

damages is "clearly unsupported and/or excessive."

An appropriate order will be entered.


                                    s/Malcolm Muir
                                    MUIR, U.S. District Judge


DATED: May 24, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS C. SKRUTSKI,                    :
                                       :
          Plaintiff                    :   No. 3:CV-03-2280
                                       :
          v.                           :   Complaint Filed 12/15/03
                                       :
JOSEPH MARUT, MICHAEL L. BRICE,        :   (Judge Muir)
REBECCA S. WARNER AND WANDA            :
GILBERT,                               :
                                       :
          Defendants                   :

ORDER
May 24, 2007


          Defendants' motion for judgment as a matter of law or,

alternatively, for a new trial or for a remittitur (Doc. 137) is

denied.

                              s/Malcolm Muir
                              MUIR, U.S. District Judge



MM:gs

33